JOHN R. GIBSON, Circuit Judge.
The issue before us in this appeal is whether Canon 5 of the Minnesota Code of Judicial Conduct, a rule promulgated by the Supreme Court of Minnesota tq deal with political activity deemed inappropriate to judicial office, violates the First and Fourteenth Amendments of the United States Constitution. Canon 5 restricts candidates for judicial office from attending and speaking at partisan political gatherings; identifying their membership in a political party; seeking, accepting, or using a political party endorsement; announcing their views on disputed legal and political issues; personally soliciting campaign contributions; or authorizing or knowingly permitting others to do these things on the candidates’ behalf. The district court[1] held that Canon 5’s provisions, except for the restriction on candidates announcing their views on disputed legal and political issues, were narrowly tailored to serve a compelling state interest in maintaining the independence and impartiality of Minnesota’s judiciary, did not offend equal protection, and were not im-permissibly vague. Republican Party v. Kelly, 63 F.Supp.2d 967, 974-88 (D.Minn.1999). As to the “announce” clause, the court concluded that a broad reading of the clause would raise constitutional difficulties. The court construed the clause narrowly to uphold its constitutionality, however, predicting that the Minnesota Supreme Court would do the same. Id. at 983-86. We affirm.
I.
The Minnesota Constitution provides that judges “shall be elected by the voters from the area which they are to serve,” and that their term of office shall be six years. Minn. Const, art. 6, § 7. In 1912, the Minnesota General Assembly designated judicial elections as nonpartisan, meaning that party affiliation is not listed when candidates file for office, nor does it appear on the ballot. Act of June 19, 1912, ch. 2, 1912 Minn. Laws Spec. Sess. 4-6.
Ethical codes restricting the campaign conduct of judicial candidates have existed in Minnesota since at least 1950, when the Minnesota District Judges Association adopted by unanimous vote the ABA’s Canons of Judicial Ethics (1924). In 1974, the Minnesota Supreme Court promulgated a code of judicial conduct that was based in large measure on the ABA’s Model Code of Judicial Conduct (1972). Over the years, the Minnesota Supreme Court has revised its ethical rules, including those relating to a candidate’s ability to attend and speak at political gatherings, to solicit campaign funds, and to discuss certain topics.
Gregory Wersal, a Minneapolis-area attorney and longtime member of the Republican Party of Minnesota, ran unsuccessfully for the office of Associate Justice of the Minnesota Supreme Court in 1996 and 1998. The year Wersal launched his first campaign, the Minnesota Supreme *858 Court revised its code of judicial conduct. The court renumbered and reorganized the canons and made several substantive changes, bringing the code largely in line with the 1990 version of the ABA’s Model Code of Judicial Conduct.
Wersal interpreted one revision to lift a twenty-two-year ban on judicial candidates speaking to partisan political gatherings. From 1974 until 1996, Canon 7 of the Minnesota Code of Judicial Conduct barred candidates and judicial incumbents from speaking at partisan political gatherings, but allowed them to accept invitations to speak on them own behalf to other groups. Canon 7(A)(2) (1974) (a judicial candidate or incumbent “may accept invitations to attend and speak on his own behalf at other than partisan political gatherings”). It also prohibited judges from engaging in political activity except on behalf of measures to improve the law or the legal system. Canon 7(A)(4) (1974). In the 1996 revisions, the Minnesota Supreme Court reorganized and revised the subsections of Canon 7 and renumbered it as Canon 5. One subsection of the newly revised Canon 5 allowed candidates and judges to speak on their own behalf to gatherings generally, while another prohibited candidates and incumbents from attending political events. Canon (5)(A)(l)(a) & (d) (1996).
Consistent with his reading of the canon, Wersal, his wife Cheryl, and members of his campaign committee spoke at Republican Party gatherings as part of Wersal’s 1996 bid for office. At these gatherings, they announced that Wersal was a member of the Republican Party and that he favored strict construction of the Constitution. They distributed campaign literature criticizing several Minnesota Supreme Court decisions on issues such as crime, welfare, and abortion as being “marked by their disregard for the Legislature and lack of common sense.” In addition, the campaign committee sought unsuccessfully to obtain an endorsement by the Republican Party.[2]
In May 1996, a delegate to a Republican district convention filed an ethical complaint against Wersal with the Office of ■Lawyers Professional Responsibility. The Office of Lawyers Professional Responsibility, under the direction of the Minnesota Lawyers Professional Responsibility Board (collectively, the Lawyers Board), investigates and prosecutes ethical violations of lawyer candidates for judicial office. The complainant questioned the propriety of Wersal’s attendance at Republican gatherings, the campaign committee’s solicitation of partisan support, and the campaign materials critical of Minnesota Supreme Court decisions. The Director of the Lawyers Board dismissed the complaint, concluding that no disciplinary action was warranted under Canon 5.
In the Director’s written determination, she first noted that it was unclear whether the Minnesota Supreme Court had intended to retain the ban on candidates speak *859 ing to political gatherings when it revised the code in 1996. Second, she pointed out that the 1996 version of Canon 5 restricted only candidates, and not their campaign committees, from soliciting publicly stated support. Finally, the Director expressed doubts about the applicability of the announce clause to Wersal’s campaign statements. Citing several decisions from other jurisdictions in which similar language was either struck down or interpreted narrowly, she also questioned whether the clause was enforceable.
Ethical complaints are deemed confidential in Minnesota, but notification of the Director’s initial determination whether a complaint should be dismissed summarily or investigated further is provided to the complainant and to the respondent lawyer. Sometime after Wersal received this notification, he withdrew his candidacy for the 1996 race, fearing that further ethical complaints would jeopardize his ability to practice law. In January of the following year, Wersal announced his candidacy for a supreme court seat opening up in 1998, and he and his campaign committee began campaigning as they had in the 1996 race, 'including the campaign committee’s pursuing the Republican Party endorsement.
The Minnesota Board on Judicial Standards (the Judicial Board), the body charged with enforcing ethical codes against judges, petitioned the Minnesota Supreme Court in September 1997 to amend Canon 5, primarily to clarify the nonpartisan nature of judicial elections. The Judicial Board, which had become aware that Wersal’s campaign committee was soliciting a political party endorsement, urged the court to add language that would limit the ability of candidates to identify themselves as members of a political organization and that would prevent campaign committees from seeking endorsements from political organizations. The Judicial Board also recommended that the court clarify that judicial candidates could not speak to political gatherings. Following a hearing, the court adopted each of these recommendations. Order Amending Canon 5 of the Code of Judicial Conduct, No. C7-81-300 (Dec. 23, 1997). The changes took effect January 1, 1998.
In February 1998, Wersal sought an advisory opinion from the Lawyers Board. He asked whether the Board would prosecute him for ethical violations if he spoke at political party gatherings or sought a Republican Party endorsement. He also inquired whether the Board would enforce the provision of Canon 5 restricting candidates from announcing their views on disputed issues. The Director answered by stating that Wersal would be subject to discipline regarding the first two actions he proposed, but that the Board could not advise him on the latter question since Wersal had not provided the Board with information about any particular statements he wished to make that might have been a view on a disputed legal or political issue. The Director also stated that the Board continued to have “significant doubts as to whether or not [the announce clause] would survive a facial challenge to its constitutionality” and that it would not enforce the provision unless the speech at issue violated other portions of the judicial ethics code.
A few days after he received this advisory opinion, Wersal filed this complaint under 42 U.S.C. § 1983 (1994), seeking declaratory and injunctive relief from the provisions of Canon 5. Joined as plaintiffs were the Republican Party of Minnesota (the Party), its affiliated organizations,[3] *860 and several other individuals and organizations interested in Wersal’s candidacy.[4] The complaint alleged that Canon 5 violated the free speech and association guarantees of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.
Wersal and the other plaintiffs moved for a temporary restraining order and/or preliminary injunction to enjoin the Lawyers Board and Judicial Board from enforcing Canon 5 so that Wersal would be free to participate in Republican precinct caucuses scheduled for early March 1998. The district court denied the motion,[5] and we subsequently affirmed. Republican Party v. Kelly, 996 F.Supp. 875 (D.Minn.1998), aff'd, No. 98-1625, 1998 WL 764782 (8th Cir. Nov. 2,1998).
While appeal of the district court’s order was pending, Wersal continued his campaign, but was forced to cancel the numerous speaking engagements he had scheduled at the precinct caucuses and other Republican events. He wrote at least five persons who he knew intended to advocate his candidacy at these events and asked them not to do so because of his concern that someone might infer that he had “knowingly permitted” them to do so in violation of Canon 5. On advice of counsel, he declined to answer questions posed by members of the press and public when he thought answering might impermissibly disclose his views on disputed issues. His wife Cheryl and his brother Mark, a member of his campaign committee, refrained from taking part in certain campaign activities on Wersal’s behalf for fear that their action would subject Wersal to discipline.
At the state Republican convention held in June, Michael Maxim, a delegate who was later joined as a plaintiff in this case, moved that the Party endorse Wersal. After considerable debate, the motion failed by a vote of 344 to 390. No other candidates for judicial office were nominated for endorsement. Because of the Republican Party’s policy of not supporting candidates it had not formally endorsed, the Party did nothing to further Wersal’s bid for office. His campaign ended when he came in third in the primary.
The parties filed cross motions for summary judgment. The district court found in favor of- defendants on all claims. Republican Party v. Kelly, 63 F.Supp.2d 967 (D.Minn.1999). The court concluded that the State had compelling interests in maintaining the actual and apparent integrity and independence of the judiciary and that the restrictions on candidates’ political activity and fund solicitation were narrowly tailored to serve those interests. Id. at 974-80. It also upheld the provisions against vagueness and equal protection *861 challenges. Id. at 980-82. In its analysis of the announce clause, the court determined that the critical issue was whether the provision was narrowly tailored to serve the State’s interest in maintaining the integrity and independence of the judiciary. The district court construed the clause to reach only the discussion of issues likely to come before the court, having considered that the Judicial Board had argued for a narrow interpretation of the clause and that the Minnesota Supreme Court, when possible, construes laws to prohibit them application to constitutionally protected expression. Id. at 985-86. The court then concluded that the provision did not offend the First Amendment. Id, at 986.
Wersal and those joined with him appeal,[6] challenging the determinations made by the district court.
II.
We review the district court’s grant of summary judgment de novo, applying the same standard the district court applied to the motion. Essco Geometric v. Harvard Indus., 46 F.3d 718, 729 (8th Cir.1995). We will affirm if we conclude there are no genuine issues of material fact and the Lawyers and Judicial Boards are entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
The plaintiffs contend that Canon 5 contravenes their First Amendment rights to freedom of speech and of association, made applicable to the States by the Due Process Clause of the Fourteenth Amendment. Tashjian v. Republican Party, 479 U.S. 208, 214, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986).
Freedom of speech reaches its high-water mark in the context of political expression. Debate about the qualification of candidates for public office is at the core of our First Amendment freedoms, Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222-23, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), valuable not only as a personal liberty, but also because of the role it plays in the proper functioning of our entire democratic form of government. Burson v. Freeman, 504 U.S. 191, 196, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992); Brown v. Hartlage, 456 U.S. 45, 52-53, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982); Buckley v. Valeo, 424 U.S. 1, 14-15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) *862 (per curiam). The closely related right of association is also particularly acute in the context of elections. Eu, 489 U.S. at 224-25, 109 S.Ct. 1013 (ban on endorsement in primary election acts at “crucial juncture” to prevent parties from promoting candidates who can translate shared ideas into action); Buckley, 424 U.S. at 15, 96 S.Ct. 612.
But even among restrictions that touch upon the core First Amendment rights to political speech and association, some restrictions are more burdensome than others, depending on the kind of activity that is restrained and on the nature of the restraint. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (standard of review depends on character and magnitude of burden on associational rights). In Buckley v. Valeo, both campaign contribution limits and expenditure limits affected core First Amendment expression and association interests, 424 U.S. at 14, 96 S.Ct. 612, yet the contribution limits placed a lesser burden on those interests than the expenditure limits did, id. at 19-23, 96 S.Ct. 612. Consequently, contribution limits have been reviewed under a less demanding standard. Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 120 S.Ct. 897, 903-04, 145 L.Ed.2d 886 (2000).
In this case, the restriction applies to conduct of candidates for judicial office.[7] There are important differences between judicial office, on the one hand, and legislative or executive office, on the other, that affect the nature of the candidate’s interest in certain kinds of policy debate.
The functioning of the judicial system differs markedly from those of the executive and legislative. In those areas, the public has the right to know the details of the programs that candidates propose to enact into law and administer. Pledges to follow certain paths are not only expected, but are desirable so that voters may make a choice between proposed agendas that affect the public. By contrast, the judicial system is based on the concept of individualized decisions on challenged conduct and interpretations of law enacted by the other branches of government.
Stretton v. Disciplinary Bd., 944 F.2d 137, 142 (3d Cir.1991). Accord Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 228 (7th Cir.1993) (“Judges remain different from legislators and executive officials ... in ways that bear on the strength of the state’s interest in restricting their freedom of speech.”); In re Chmura, 461 Mich. 517, 608 N.W.2d 31, 39-40 (“[T]he differences between judges and other government officials bear on the strength of the state’s interest in restricting political speech.”), cert. denied, — U.S. -, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000). Whereas affiliation with a partisan program is thus at the heart of executive and legislative campaigns, a State may conclude that it has no role in judicial campaigns because of the neutral, decision-making nature of the judicial function. “Because the judicial office is different in key respects from other offices, the state may regulate its judges with the differences in mind .... [The judicial candidate] cannot, consistent with the proper exercise of his judicial powers, bind himself to decide particular cases in order to achieve a given programmatic result.” Morial v. Judiciary Comm’n, 565 F.2d 295, 305 (5th- Cir.1977). The judicial candidate simply does not have a First Amendment right to promise to abuse his office. See Brown, 456 U.S. *863 at 54-56, 102 S.Ct. 1523 (some kinds of campaign promises “may be declared illegal without constitutional difficulty”); In re Kaiser, 111 Wash.2d 275, 759 P.2d 392, 400 (1988) (holding statements of party affiliation do not refer to subject relevant to judicial qualification and therefore are not protected by First Amendment). Recognizing that the judiciary has a different job to do, Minnesota has provided that its judicial offices are nonpartisan. Minn. Stat. § 204B.06, subd. 6 (1998); Peterson v. Stafford, 490 N.W.2d 418, 420 (Minn.1992). Thus, restrictions on Minnesota judicial candidates’ speech are entirely different from limitations on the speech of candidates for partisan office, such as those in Eu, 489 U.S. at 217, 109 S.Ct. 1013 (striking statute making it misdemeanor for primary candidates to claim endorsement by party).
Another important aspect of the restraint in this case is that it does not discriminate in favor of .one viewpoint or other. Minnesota’s restraint of judicial candidates’ First Amendment rights is a straightforward restriction of expression, rather than being incidental to some other type of regulation, such as a content-neutral time, place, or manner restriction, and in one sense, it is not content-neutral because it restricts speech on the basis of subject-matter. In Burson v. Freeman, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), the Supreme Court considered a state law establishing a 100-foot “campaign-free” zone around polling places. Justice Blackmun rejected the assertion that the law was content-neutral: “Whether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a political campaign.” Id. at 197, 112 S.Ct. 1846. Similarly, in this case, the bans on accepting political party endorsements, attending political party gatherings, identifying oneself as a party member, announcing views on disputed legal and political issues, and soliciting funds depend entirely on the subject matter of the speech. See Hill v. Colorado, 530 U.S: 703, 120 S.Ct. 2480, 2500, 147 L.Ed.2d 597 (2000) (Souter, J., concurring) (government held to very exacting and rarely satisfied standard when it disfavors discussion of particular subjects or articulation of particular viewpoints).
However, the restriction in this case avoids discriminating against a particular viewpoint, which is the most serious threat to First Amendment rights. See R.A.V. v. City of St. Paul, 505 U.S. 377, 387-90, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (treating “content discrimination” not as an evil in itself, but as evidence that “official suppression of ideas is afoot”).' In United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Supreme Court entertained a challenge to the Hatch Act, which prohibited federal employees from taking an active part in political management or political campaigns. The Court prefaced its analysis with the observation that the challenged restrictions did not discriminate on the basis of viewpoint:
The restrictions so far imposed on federal employees are not aimed at particular parties, groups, or points of view, but apply equally to all partisan activities of the type described. They discriminate against no racial, ethnic, or religious minorities. Nor do they seek to control political opinions or beliefs, or to interfere with or influence anyone’s vote at the polls.
Id. at 564, 93 S.Ct. 2880. Accord Morial, 565 F.2d at 301-02 (requirement that sitting judge resign before running for a nonjudicial office did not penalize belief in any particular idea and therefore did not touch core First Amendment values). Thus, al *864 though Canon 5 does burden First Amendment rights, the burden is less onerous than it might otherwise be because Canon 5 does not discriminate on the basis of viewpoint and because it governs only judicial elections.
Because the restrictions on the employees’ rights in Letter Carriers were similar to those of Canon 5, the defendants suggest we look to Letter Carriers and cases following it, which judged restrictions on speech of government employees under a balancing test less rigorous than strict First Amendment scrutiny. See Letter Carriers, 413 U.S. at 564, 93 S.Ct. 2880. Wersal argues that we cannot apply the Letter Carriers balancing test to a restriction on his speech because he is not a government employee. But even though he is not presently a government employee, Canon 5 applies to him only insofar as he seeks to become one. The State can reasonably conclude that Wersal’s actions as a candidate could affect his actions as a judge if he is elected, see Buckley v. Valeo, 424 U.S. at 26-27, 96 S.Ct. 612 (discussing danger of corruption from contributions to “current and potential office holders”), and so the reasoning of the balancing test cases fairly applies to him. However, the restrictions in this case are different from the Hatch Act provisions challenged in Letter Carriers because, while the Hatch Act restrained political activity of government employees, Canon 5 restrains the activity of candidates engaged in an election contest. The burden on the plaintiff in either case may be comparable, but the public’s interest in free speech is greater where the person subject to restrictions is a candidate for public office, about whom the public is obliged to inform itself. Therefore, we will invoke strict scrutiny and examine the restrictions at issue to determine whether they are narrowly tailored to serve a compelling state interest.[8] See Stretton, 944 F.2d at 141-42; see generally California Democratic Party v. Jones, 530 U.S. 567, 120 S.Ct. 2402, 2412, 147 L.Ed.2d 502 (2000); Burson, 504 U.S. at 198, 112 S.Ct. 1846; Brown, 456 U.S. at 53-54, 102 S.Ct. 1523.
III.
The governmental interests put forth to justify Canon 5 are undeniably compelling. The Boards contend that the restrictions are necessary to guarantee the independence of the Minnesota judiciary, which in turn is crucial to preserve the justice of its courts of law and its citizens’ faith in those courts. There is simply no question but that a judge’s ability to apply the law neutrally is a compelling governmental interest of the highest order.
Judges should decide cases in accordance with law rather than with any express or implied commitments that they may have made to their campaign supporters or to others .... Justice under law is as fundamental a part of the Western political tradition as democratic self-government and is historically more deeply rooted, having been essentially uncontested within the mainstream of the tradition since at least Cicero’s time
Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 227 (7th Cir.1993). Accord Stretton v. Disciplinary Bd., 944 F.2d 137, 142 (3d Cir.1991) (“There can be no question ... that a state has a compelling interest in the integrity of its judiciary _ If judicial candidates during a cam *865 paign prejudge cases that later come before them, the concept of impartial justice becomes a mockery.”); Mortal v. Judiciary Comm’n, 565 F.2d 295, 302 (5th Cir.1977) (“Ours is an era in which members of the judiciary often are called upon to adjudicate cases squarely presenting hotly contested social or political issues. The state’s interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect.”).
The plaintiffs contend that Minnesota has no interest in the independence of its judiciary because it has chosen to make its judges stand for election. Wersal says: “Contrary to popular understanding — even among lawyers — Minnesota does not have an ‘independent’ judiciary. Minnesota has an elected judiciary that its founding citizens specifically adopted in the Minnesota Constitution to insure its judiciary was not ‘independent’ from the voters.” Wersal argues that when the citizens at the Democratic[9] Minnesota constitutional convention in 1857 debated whether the judiciary should be appointed or elected, they considered the then-recent Dred Scott[10] decision. They decided to choose judges by election and to give them finite terms, rather than life tenure, in order to retain the ability to oust unsatisfactory judges.
The Minnesota Supreme Court has considered the broad' history of Minnesota judicial elections and has concluded that the State has historically pursued the ideal of an independent judiciary. In Peterson v. Stafford, 490 N.W.2d 418 (Minn.1992), the Minnesota Supreme Court considered an equal protection challenge to Minn.Stat. § 204B.36, subds. 4 and 5 (1990), which provided that an incumbent judge should be designated as such on the ballot. In explaining the reason for the designation, the court identified the underpinnings of the Minnesota selection process as the search for an independent judiciary:
The methods by which the federal system and other states initially select and then elect or retain judges are varied, yet the explicit or implicit goal of the constitutional provisions and enabling legislation is the same: to create and maintain an independent judiciary as free from political, economic and social pressure as possible so judges can decide cases without those influences[11] .... While the framers of our state constitution have developed a system of selection and election quite different from that federal scheme, they too designed a plan to recognize the uniqueness and independence of the state judiciary.
Id. at 420. Peterson traced the history of the Minnesota judicial selection process beginning with the adoption of the Minnesota Constitution in 1857, which provided that judges of the Supreme Court should be elected for seven-year terms, Minn. Const, art. 6, § 3 (1857), so that judicial elections did not coincide with elections for other offices. 490 N.W.2d at 420. Moreover, the 1857 Constitution provided that judges must be “learned in the law.” Minn. Const, art. 6, § 5 (1857). “Implicit in this requirement is recognition that those elected as judges will be subject to the restrictive canons of conduct governing the profession of law.” 490 N.W.2d at 422. *866 The term length was reduced to six years in 1883, which made more apparent the “difficulties associated with partisan judicial elections.” Id. at 420. In 1912, the legislature enacted nonpartisan ballot legislation, Act of June 19, 1912, ch. 2, 1912 Minn. Laws, Spec. Sess. 4-6, which made the State’s judicial offices nonpartisan. See id. at § 182. The court characterized this reform as an attempt to ensure the “judicial impartiality required to decide cases free from political maneuvering.” 490 N.W.2d at 422.
Further, the Minnesota Constitution provided that whenever there was a judicial vacancy, the governor should appoint the successor, who would serve until his successor was elected.[12] Minn. Const, art. 6, § 10 (1857). In 1972, at the time when the State was studying the possible advantages of a merit selection plan, the time frame for this successor election was extended from the next general election occurring more than thirty days after the vacancy to the next general election occurring more than one year following the vacancy, in order to allow the electorate enough time to assess the new judge’s competence. Minn. Const, art. 6, § 8 (amended 1972); see Peterson, 490 N.W.2d at 422-23.
In the context of this history, Peterson held that the ballot designation of the incumbent was rational:
It seems clear that Minnesota has adopted its own middle-of-the-road approach to judicial selection. The open election process has been retained, but with a quasi-retention feature which simply informs the voter who the incumbent candidate is and who the challenger is. This arrangement acts as a check on the gubernatorial appointment process by keeping the ultimate choice with the voters while, at the same time, recognizing the unique independent nature of the judicial function.
490 N.W.2d at 425. Thus, the Minnesota Supreme Court has considered in depth the history and structure of Minnesota judicial elections procedures and has concluded that they are designed in large part to protect the independence of the State’s judiciary.[13]
Other courts considering the same question have held that the decision to elect *867 judges cannot be regarded as abandonment of a State’s interest in an independent judiciary. See Buckley, 997 F.2d at 227 (“Judges remain different from legislators and executive officials, even when all are elected .... ”); Stretton, 944 F.2d at 142 (“The fact that a state chooses to select its judges by popular election ... does not signify the abandonment of the ideal of an impartial judiciary carrying out its duties fairly and thoroughly.”); In re Chmura, 461 Mich. 517, 608 N.W.2d 31, 39-40 (“By providing for the election of judges, the people of Michigan have not transformed judges into legislators or executives .... ”), cert. denied, — U.S.. -, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000).
The governmental interest in an inde- ' pendent and impartial judiciary is matched by its equally important interest in preserving public confidence in that independence and impartiality. See Cox v. Louisiana, 379 U.S. 559, 565, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (“A State may also properly protect the judicial process from being misjudged in the minds of the public.”); Suster v. Marshall, 149 F.3d 523, 532 (6th Cir.1998) (State’s interest in preventing judicial conniption or appearance of corruption compelling); cf. Reeder v. Kansas City Bd. of Police Comm’rs, 733 F.2d 543, 547 (8th Cir.1984) (“It is proper for a state to insist that the police be, and appear to be, above reproach, like Caesar’s wife.”). Letter Carriers stressed that the appearance of corruption resulting from partisan activities of government employees could affect the entire government: “[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.” 413 U.S. at 565, 93 S.Ct. 2880.
Finally, a State has an interest in protecting its judges from pressure to participate in partisan activities, if it reasonably concludes that this protection is necessary to retain a high caliber of judges. “There could hardly be a higher governmental interest than a State’s interest in the quality of its judiciary.” Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 848, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (Stewart, J., concurring in judgment). Letter Carriers applied an analogous principle when it justified the Hatch Act partly on the ground that it meant to protect government employees from political pressure from their superiors. 413 U.S. at 566-67, 93 S.Ct. 2880.
We therefore conclude that the Lawyers and Judicial Boards have shown compelling governmental interests[14] to justify *868 Canon 5, and we turn to the necessity and narrow tailoring of the various restrictions found within it.
IV.
We first address Wersal’s challenge to the three provisions of Canon 5(A) that prohibit him from attending political party gatherings; from seeking, accepting, or using endorsements from a party; and from identifying himself as a member of the party, except as necessary to vote. Minn. Code of Jud. Conduct Canon 5(A)(1)(a) & (d) (1998).[15]
A.
We must determine whether these restraints protect Minnesota’s interests in the integrity and quality of its judiciary. United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 120 S.Ct. 1878, 1891, 146 L.Ed.2d 865 (2000). The burden of proof rests with the State. Id. at 1888.
A threshold question is what sort of evidence the Boards must provide substantiating the threat to the governmental interest. In Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), the Supreme Court declined to answer this question definitively, id. at 907, but gave this guidance: “The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.” Id. at 906. The asserted danger to the governmental interest in that case, danger of corruption attendant on large campaign contributions, was neither novel nor implausible, so that' the State’s burden was amply satisfied by its production of a state senator’s affidavit and newspaper articles showing cases of apparent corruption. Id. at 907-08. The Court also assigned some evidentiary value to the passage of a campaign contribution limitation by a large margin at a referendum, which demonstrated public concern about corruption.[16] Id. at 908. The Court quoted City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), in which the city’s evidence was said to be adequate, “so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.” Id. at 907 n. 6. Shrink Missouri also noted the lack of evidence tending to disprove the State’s theory. Id. at 908.
The idea that judicial integrity is threatened by judges deploying political organizations in connection with campaigns for judicial office is neither novel nor implausible. In Letter Carriers, the Supreme Court recognized that partisanship of governmental officials created a risk of corruption that justified the restraint of those officials’ partisan activities. Although the Hatch Act applied to employees of the *869 executive branch, the Court’s reasoning could as well have b'een written about judges and in fact applies with even greater urgency to them:
It seems fundamental in the first place that employees in the Executive Branch of the government, or those working for any of its agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party. They are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof. A major thesis of the Hatch Act is that to serve this great end of Government — the impartial execution of the laws — it is essential that federal employees, for example, not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets. Forbidding activities like these will reduce the hazards to fair and effective government.
United States Civil Serv. Comm’n v. National Ass’n of Letter Carriers, 413 U.S. 548, 563-64, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). Accord LaMontagne v. St. Louis Dev. Carp., 172 F.3d 555, 557 (8th Cir.1999) (city employees), cert. denied, 528 U.S. 873, 120 S.Ct. 176, 145 L.Ed.2d 148 (1999); Reeder v. Kansas City Bd. of Police Comm’rs, 733 F.2d 543, 547 (8th Cir.1984) (police officers); Otten v. Schicker, 655 F.2d 142, 144 (8th Cir.1981) (same).
The restriction here was adopted by the Minnesota Supreme Court, which has consistently over time perceived partisanship as posing a particular threat to judicial integrity. Canon 7(A) of Minnesota’s 1974 Code of Judicial Conduct also restricted a judicial candidate’s political activities broadly, specifically permitting a candidate for elective judicial office to appear at “other than partisan political gatherings during the year in which he is a candidate.” Minn.Code of Judicial Conduct Canon 7(A)(2) (1974) (emphasis added). The comments of the advisory committee accompanying the 1995 Minnesota Code of Judicial Conduct state: “Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. The integrity and independence of judges depends in turn upon their acting without fear or favor.” Canon 1(A) cmt. In proposing to the court the 1997 amendments to clarify the prohibitions on partisan conduct the Judicial Board stated: “The Judicial Standards Board members believe the proposed language changes will make it clear that judicial elections are to be nonpartisan. Minnesota has a long tradition of nonpartisan judicial elections, and these changes will assure a strong, independent judiciary.”
Long before the present canons were adopted, justices of the Minnesota Supreme Court had also expressed the idea that merely avoiding party designations on the ballot was insufficient to protect the Minnesota judiciary from the dangers of partisan involvement. In Moon v. Halverson, 206 Minn. 331, 288 N.W. 579 (1939), a candidate for registrar of deeds, an office designated by statute as nonpartisan, had solicited and received the endorsement of a political party. The court held that the Minnesota nonpartisan statute prescribed only that the candidate’s party affiliation could not appear on the ballot and that the candidate could not declare his party when filing for office. The statute did not forbid party endorsement of candidates for nonpartisan office. 288 N.W. at 581. Justice Loring, joined by Justice Olson, concurred specially to add that this statute was not sufficient to protect the State’s judiciary *870 from the dangers of partisan pressure, which he felt had been at work:
When candidates for such offices were placed on a non-partisan ballot it was, it seems to me, the purpose of the legislature to lift the judgeships above sordid political influence and to free the candidates from obligation to a political party so that if elected they might render judicial instead of partisan political decisions on matters where party programs, party interests or even prominent party leaders might be involved. The abuse and accusations of party treason which have been heaped upon some judges in the recent past because of decisions thought to be contrary to the interests of an indorsing party ought to be evidence enough of'the impropriety of party indorsements and of their purpose to induce partisan political rather than impartial judicial decisions.
Id. at 581-82.
More recently, the court in Peterson v. Stafford, 490 N.W.2d 418, 425 (Minn.1992), stated that the nature of judicial office requires the “holder studiously to avoid partisan politics, refrain from all discussions of public issues and restrict one’s membership and participation in organization to those primarily of a professional nature.”
Additionally, the Boards have adduced evidence of the necessity of reform measures in the form of affidavits by a former governor, Arne H. Carlson, and a former Chief Justice of the Minnesota Supreme Court, A.M. (Sandy) Keith. Chief Justice Keith was a member of the Minnesota Supreme Court when the Court considered and approved the amendments to Canon 5. He testified that, based on his experience, if the Minnesota Code were changed to permit partisan activity, judges would be under pressure to “decide cases in ways that would impress the judge’s supporters favorably,” and eventually, partisanship would dataage the public’s confidence in the judiciary. Governor Carlson testified: “For the public to read newspaper headlines that a political party has endorsed and will work to elect a particular candidate would greatly harm the public’s confidence in the independence of the judiciary.” Both Chief Justice Keith and Governor Carlson testified that they believed that allowing judicial elections to become partisan contests would discourage many qualified candidates from seeking election.
The Boards have also produced a news account of the dangers partisan elections have posed in Texas, which included interviews with witnesses who believed that judges’ decisions were affected by the need for political and financial support and that the public perceived “that justice is for sale in this state.” Editorials from Texas newspapers reported a public perception that rulings were influenced by campaign obligations. The testimony at the 1997 hearing before the Minnesota Supreme Court on the proposal to amend Canon 5 was replete with references to the undesirable situation existing in other States with partisan judicial elections, particularly Texas. Amendment to Canon 5 of the Code of Judicial Conduct: Hearing Before the Minnesota Supreme Court, No. C7-81-300, at 32, 36, 50, 65-68 (1997).
In contrast to the evidence amassed by the Boards, the plaintiffs have not adduced evidence tending to disprove the threat to the integrity or reputation of the judiciary from involvement with partisan politics. See Shrink Mo., 120 S.Ct. at 908. This is an issue where “a long history, a substantial consensus, and simple common sense,” Burson, 504 U.S. at 211, 112 S.Ct. 1846, combine to show that regulation is necessary to protect the institution of the judiciary from the dangers of partisanship and *871 corruption. The record suffices to support the Minnesota Supreme Court’s assessment that the threat of actual and apparent corruption is real and reform measures are necessary. Cf. Eu v. San Francisco Democratic Cent. Comm., 489 U.S. 214, 229, 109 S.Ct. 1018, 103 L.Ed.2d 271 (1989) (striking ban on party endorsement of candidates in party primaries where there was no evidence that ban served purpose of preventing fraud and corruption). Additionally, there is record evidence showing that without protection from partisan pressures, the State will be less able to recruit judicial candidates of the highest caliber.
The dissent contends that Canon 5 is not necessary because it does not achieve its stated end. Infra at 899-900. The argument is not precisely that Canon 5 does not accomplish its end as far as it goes, but that it is underinclusive — in other words, that the measure does not eliminate all the conduct posing the threat the government claims to be addressing because a candidate may attend meetings of and accept endorsements from politically active groups other than political parties. The dissent contends that in cases burdening a fundamental right “failure to solve the entire asserted problem is fatal.” Infra at 900 n. 44 (citing 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), and City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 418, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). Wersal makes a similar argument, relying on Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), and R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). These cases do not stand for such a broad rule. Generally, underinelusiveness of a speech regulation is not an independent ground for invalidating the regulation, but rather points to the possibility that the government is discriminating on the basis of content or that the government’s asserted interest is not truly pressing. See City of Ladue v. Gilleo, 512 U.S. 43, 51-53, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 493, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (Souter, J„ dissenting). When underinclusiveness of a regulation betrays content-discrimination, the standard of review must be raised to strict scrutiny. For instance, R.A.V. invalidated an ordinance prohibiting fighting words directed at some groups, but not others. The Supreme Court held that the principle for distinguishing between fighting words that were prohibited by the ordinance and those that were not had nothing to do with the rationale for permitting regulation of fighting words in the first place, but instead amounted to content discrimination. Therefore, the Court could not apply the relaxed standard appropriate for review of regulations of fighting words. 505 U.S. at 386, 112 S.Ct. 2538. The ordinance failed under strict scrutiny review. Id. at 395-96, 112 S.Ct. 2538. In this case, we have already established that Canon 5 discriminates on the basis of content (though not on the basis of viewpoint) and that we must conduct strict scrutiny. Supra at 863-64.
In cases in which underinclusiveness of a regulation suggests that the regulation is not truly necessary to further a compelling governmental interest, the government’s obligation is to “establish the empirical reality of the problems it purports to be addressing.” Glickman, 521 U.S. at 493, 117 S.Ct. 2130 (Souter, J., dissenting). As part of our strict scrutiny, we have determined that the State established that a candidate’s use of political parties in judicial campaigns poses a real threat to the State’s compelling interests. Supra at 861-71. Thus, we have already undertaken the heightened scrutiny that underin- *872 elusiveness of a regulation would suggest is necessary.
But even if the'eases cited by the dissent and Wersal indicated that underinclu-siveness poses a First Amendment problem in its own right, these cases concern only arbitrary underinclusiveness, which arises when the principle for distinguishing, regulated conduct from non-regulated conduct does not promote the government’s asserted purpose. In Carey, 447 U.S. at 457, 464, 100 S.Ct. 2286, the challenged regulation prohibited residential picketing other than labor picketing in order to protect residential privacy. In Discovery Network, 507 U.S. at 415, 113 S.Ct. 1505, the city banned use of newsracks to distribute commercial handbills, but not newspapers, as a way of preventing news-racks from becoming a safety hazard and eyesore. The types of picketing and news-racks, respectively, that were regulated posed no greater threat to the asserted governmental interest than those that were exempted from regulation, and the regulations were thus invalid. See Carey, 447 U.S. at 465, 100 S.Ct. 2286; Discovery Network, 507 U.S. at 424-28, 113 S.Ct. 1505. In kk Liquormart a ban on advertising alcoholic beverages was invalid where any connection between the advertising ban and the State’s desired result of reducing alcohol consumption would have been “purely fortuitous.” 517 U.S. at 506-07, 116 S.Ct. 1495 (Opinion of Stevens, J.).
In contrast to these cases, when under-inclusiveness results from a choice to address a greater threat before a lesser, it does not run afoul of the First Amendment. See, e.g., Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 470-71 (8th Cir.1991); Stretton v. Disciplinary Bd., 944 F.2d 137, 146 (3d Cir.1991) (“[W]e cannot say that the state may not draw a line at the point where the coercive effect [of judicial campaign fund-raising], or its appearance, is at its most intense — personal solicitation by the candidate.”). Indeed, a categorical rule against underinclusiveness for its own sake would coerce governments to regulate speech more broadly than they consider necessary, which is hardly the usual goal of First Amendment jurisprudence.[17] Here, the State has shown that a candidate’s use of political parties in judicial campaigns poses a greater threat to the compelling state interests than involvement of other kinds of groups. See infra at 39^0. Therefore, the State did not violate the First Amendment in so limiting Canon 5.
B.
As the final step of our review of the three restrictions on Wersal’s political activity, we ask whether they are narrowly drawn to address the compelling state interests. See California Democratic Party v. Jones, 530 U.S. 567, 120 S.Ct. 2402, 2412, 2414, 147 L.Ed.2d 502 (2000); Brown v. Hartlage, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) (restriction must operate without “unnecessarily circumscribing protected expression”).
The Minnesota Supreme Court has attempted to prevent judicial candidates from incurring, or seeming to incur, debts to political parties that could compromise their independence, while allowing them alternative means of communicating subjects of valid interest to voters. Candidates may, for instance, speak to gatherings other than political organization gatherings; appear in newspaper, television, or other media advertisements sup *873 porting their candidacy; and distribute pamphlets and other promotional literature. Canon 5(B)(1). Furthermore, candidates may establish committees to campaign for them in various ways, including obtaining public statements of support (other than from political organizations). Canon 5(B)(2).
Wersal argues that since various other States and the drafters of the ABA Model Code of Judicial Conduct have not found it necessary to forbid attendance at party gatherings, acceptance of party endorsements, and identification of party affiliation, Minnesota’s restrictions must be broader than necessary. But Wersal relies on the laws of States that have in fact limited political activity by measures similar to those before us.[18] There is also the authority of Letter Carriers and the other cases in which courts held it was proper to limit partisan political activity of executive employees. See supra at 867-68.
The Party contends that the prohibition on disclosing party affiliation is not narrowly tailored because it prohibits disclosing past party affiliation as well as present. The Judicial Board states that it “simply prevents the judge from affirmatively stating his current political affiliation.” However, the report submitted to the Minnesota Supreme Court at the time the party affiliation language was adopted states that it would prohibit candidates from identifying, themselves “as past or present members of a political organization.” The language was adopted as proposed. The Minnesota Supreme Court apparently concluded that the public would infer that identification of past membership was tantamount to identification of present membership. See In re Kaiser, 111 Wash.2d 275, 759 P.2d 892, 395 (1988) (en banc) (concluding judge violated prohibition on stating party affiliation by stating past affiliation). It was therefore reasonable to extend the prohibition on stating party affiliation to include past affiliation as well, lest the measure be rendered ineffective.
The Party further contends that Canon 5 is not narrowly tailored because. Canon 5(A)(3) applies to a candidate’s supporters as well as to the candidate. Specifically, Maxim argues that he had to avoid “seeking out any relationship with Gregory Wersal” in order to avoid coming within the scope of persons who were prohibited by Canon 5(A)(3) from doing for Wersal what he could not do for himself — i.e., attending a party gathering or seeking a party endorsement. Similarly, the members of Wersal’s campaign committee contend that the restriction is overbroad because the committee was prohibited from seeking a party endorsement of Wersal. This argument has two parts: first, that the regulation is overinclusive because it affects third parties who have a relationship with Wersal; and second, that the regulation is vague because third parties cannot predict under what circumstances their actions will be imputed to Wersal.
Two. district court cases have anticipated the overinclusiveness issue. In Concerned *874 Democrats v. Reno, 458 F.Supp. 60, 65 (S.D.Fla.1978), and California Democratic Party v. Lungren, 919 F.Supp. 1397 (N.D.Cal.1996), courts held that state laws prohibiting political party endorsements of judicial candidates or of all nonpartisan candidates, respectively, were not narrowly tailored because they restricted the political parties’ behavior when it was only necessary to restrict the candidate’s behavior. Lungren assumed, arguendo, that the State had a compelling interest in preventing nonpartisan office holders from engaging in partisan activity, but held that the law “misse[d] the mark” in addressing that interest:
The evil sought to be combatted is the unseemly partisanship of nonpartisan officeholders once they are in office, not the partisanship of political parties (which, of course, is the very nature of political parties). Section 6(b) purports to prevent officeholders from being “beholden” to political parties by imposing a ban on the parties’ speech about candidates for office, rather than (as the Supreme Court approved in Letter Carriers) a ban on the partisan political conduct of the officeholders themselves. The distinction is crucial. The government has an interest in the manner in which its elected officials conduct themselves while in office. The government does not and cannot have a legitimate interest in silencing the speech of third parties about the qualifications and political views of candidates for those offices.
919 F.Supp. at 1402.
These district court cases convincingly reason that because the State’s compelling interest is in the rectitude of the candidate', a narrowly tailored restriction will regulate expressions by the candidate, not third parties. However, the language of Canon 5(A)(3) is so limited. It does not purport to govern what other persons do, but what the candidate authorizes or knowingly permits them to do. The canon therefore does not affect persons not subject to the candidate’s authority and control. See Johnson v. Holzemer, 263 Minn. 227, 116 N.W.2d 673, 679 (1962) (“knowingly permit” extends only to persons having right of authoritative control over actor who are actually aware of his or her activity). Canon 5(A)(3) simply prohibits the candidate from accomplishing by the acts of an agent what the candidate is forbidden to personally. The Director of the Lawyers Board, the body charged with enforcing Canon 5(A)(3) in Wersal’s case, confirms that there is no threat of disciplinary action without the candidate himself authorizing or permitting the action of the supporter. Insofar as Canon 5(A)(3)(a) refers to members of the candidate’s family, it does not limit their activities, but rather affects the candidate’s actions towards them: the candidate shall “encourage” them to adhere to the standards applicable to the candidate. As for persons who are within the candidate’s authority and control as members of the candidate committees authorized by Canon 5(B)(2), they have voluntarily assumed that relation, and therefore may subject themselves to certain restraints which are necessary to make effective the restrictions on the candidate. Cf. Letter Carriers, 413 U.S. at 581-82, 93 S.Ct. 2880 (Appendix to the Court’s opinion) (United States Civil Serv. Comm’n Form No. 1236, which Congress intended to serve as its definition of the general proscription against partisan activities, id. at 572-74, 93 S.Ct. 2880, prohibits “activity by indirection” when, by collusion or coercion, employee causes another to do what employee may not do directly). The limitation of Canon 5’s reach to the candidate and to persons within the candidate’s control thus distinguishes this case from Eu, 489 U.S. at 221, *875 109 S.Ct. 1013, in which there was an “outright ban” on political parties endorsing candidates.
The Party argues that a candidate’s supporters cannot tell under what circumstances them actions will be imputed to the candidate. A restriction on speech must not be so vague that people of ordinary intelligence cannot tell what it prohibits. Broadrick v. Oklahoma, 413 U.S. 601, 607, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). But see Berger v. Supreme Court, No. 87-3935, 1988 WL 114792, at *3 (6th Cir. Oct.31, 1988) (notice requirements less stringent in enforcing non-criminal code of judicial conduct than if criminal penalties at stake). Canon 5(A)(3)(c) limits the scope of its language by adding the requirement that the candidate’s permission be “knowing.” This requirement prevents the sort of violation by mistake the non-candidate plaintiffs claim has chilled their speech. See Chulchian v. City of Indianapolis, 633 F.2d 27, 31 (7th Cir.1980) (ordinance prohibiting person from “permitting” conduct includes requirement that person know of conduct and therefore is not unduly vague). Moreover, both Canon 5(A)(3)(a), dealing with family members, and Canon 5(A)(3)(c), dealing with authorizing or knowingly permitting others to act, include the concept of the candidate’s right- to control the speaker. Johnson, 116 N.W.2d at 679. Canon 5(A)(3) is therefore not unduly vague.
C.
The Party contends that the restrictions on a candidate’s partisan activity violate its rights to equal protection because Canon 5 restricts association with political parties, but not other organizations that could affect a judge’s independence or the public’s perception of that independence. We have already determined that the restraints on Wersal’s speech and association are necessary to serve a compelling state interest. To conclude that the same restraints violate the Equal Protection Clause, we would have to determine that Canon 5 burdens the rights of political party members more than others and that “such differential treatment is not justified.” California Med. Ass’n v. FEC, 453 U.S. 182, 200, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). In Broadrick, in rejecting a First Amendment overbreadth challenge to Oklahoma’s restrictions on partisan activities by government employees, the Supreme Court also rejected an equal protection challenge to the same law:
Appellants also claim that § 818 violated the Equal Protection Clause of the Fourteenth Amendment by singling out classified service employees for restrictions on partisan political expression while leaving unclassified personnel free from such restrictions .... [T]he legislature must have some leeway in determining which of its employment positions require restrictions on partisan political activities and which may be left unregulated. And a State can hardly be faulted for attempting to limit the positions upon which such restrictions are placed.
413 U.S. at 607 n. 5, 93 S.Ct. 2908 (citation omitted).
Our discussion regarding the State’s interest in the independence of. its judiciary demonstrates how Minnesota has historically viewed partisanship as a particular threat to the integrity of its courts, supra at 869-71, and we need not reiterate this discussion. Restrictions reaching only partisan, rather than nonpartisan, political activity have been upheld in other cases. See Letter Carriers, 413 U.S. at 562, 93 S.Ct. 2880; Bauers v. Cornett, 865 F.2d 1517, 1524-25 (8th Cir.1989) (application of statutes to nonpartisan activity would have raised a different constitutional question *876 than application to partisan activity). Political parties specialize in the business of electing candidates and have a powerful machinery for achieving that end, including large membership and fund-raising organizations. Those parties are simply in a better position than other organizations to hold a candidate in thrall. Moreover, because political parties have comprehensive platforms, obligation to a party has a great likelihood of compromising a judge’s independence on a wide array of issues. Finally, legislatures are bodies in which, for the most part, the members owe allegiance to a political party, not only for financial support and endorsement in their campaigns for office, but also for political support within the legislative process itself. No single legislator has the power to enact laws. Therefore, the sharing of common partisan affiliation plays an integral role in enactment of legislation. If the judiciary is then expected to review such legislation neutrally, a State may conclude that it is crucial that the judges not be beholden to a party responsible for enactment of the legislation, or to one that opposed it.
It is also relevant that a judge’s participation in associations other than political parties is regulated by Canon 4, which imposes broad requirements that judges avoid involvement that could cast doubt on their impartiality or interfere with proper performance of their judicial duties. At the Minnesota Supreme Court’s 1997 hearing on amending Canon 5, DePaul Willette, Executive Secretary of the Judicial Board, testified that the danger of judicial candidates affiliating with single-issue interest groups was adequately addressed by the provision of Canon 5 prohibiting announcement of the candidate’s views on disputed legal or political issues, Canon 5(A)(3)(d)®. Amendment of Canon 5 of the Code of Judicial Conduct: Hearing before the Minnesota Supreme Court, No. C7-81-300, at 12-13 (1997).
We conclude that the State has justified its differential treatment imposing greater restrictions on a judicial candidate’s partisan political activities than on association with other kinds of organizations.
V.
We turn next to Wersal’s claim that Canon 5’s “announce” clause, which prohibits judicial candidates from announcing their “views on disputed legal or political issues,”[19] violates his free speech rights because it is not narrowly tailored to achieve any compelling state interest.[20] We have already determined that the interests proffered by the State to justify this restriction are compelling governmental- interests of the highest order, so we proceed to the next step of our inquiry and *877 address whether the restriction is necessary to further these interests. See United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 120 S.Ct. 1878, 1891, 146 L.Ed.2d 865 (2000); see also Brown v. Hartlage, 456 U.S. 45, 53-54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982).
A.
As we have discussed, it is consistent with the essential nature of campaigns for legislative and executive offices for candidates to detail and make promises about the programs that they intend to enact into law and to administer. For judicial officers, however, a State may determine that this mode of campaigning, insofar as it relates to how judges will decide cases, is fundamentally at odds with the judges’ obligation to render impartial decisions based on the law and facts. At the time of the campaign, the candidate simply cannot predict what the facts or arguments in a particular case may be, the precise way in which legal issues will present themselves, or other crucial factors that need be considered before a court issues a final decision. See Berger v. Supreme Court, No. 87-3935, 1988 WL 114792, at *3 (6th Cir. Oct.31, 1988) (“[T]he very purpose of the judicial function makes inappropriate the same kind of particularized pledges and predetermined commitments that mark campaigns for legislative and executive office.”) (internal quotations omitted); Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 227 (7th Cir.1993) (free discussion of judicial candidate’s views conflicts with the “historically more deeply rooted” concept of justice under the law); Stretton v. Disciplinary Bd., 944 F.2d 137, 142 (3d Cir.1991) (prejudging cases at campaign stage makes mockery of the concept of an impartial judiciary and undermines public confidence in rule of law).
Canon 5’s announce clause restrains candidates from making statements in their campaigns about their views on disputed legal and political issues, and thus prevents candidates from implying how they would decide cases that might come before them as judge. Wersal maintains that this restriction is not necessary because Canon 5 already protects the State’s interests through bans on candidates making pledges or promises of conduct in office other than the faithful performance of their duties and on candidates manifesting bias or prejudice inappropriate to the judicial office. See Canon 5(A)(3)(d)® & (ii).
To be sure, the pledges and promises provision of Canon 5(A)(3)(d)® addresses the type of campaign conduct that most blatantly subverts the judicial office— pledges by candidates to make specific decisions on the bench. However, it does not reach the full range of campaign activity that can undermine the State’s interests in an independent and impartial judiciary. It would not, for example, reach declarations by candidates that legislation relating to hot-button social issues is or is not constitutional. It also would not apply to candidates who publicized their opinions about how unsettled legal issues should be resolved. Both instances raise the specter that the candidates are declaring how they would decide questions that might come before them as judges in order to gain support for their candidacies. See Laird v. Tatum, 409 U.S. 824, 836 n. 5, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Rehnquist, J.) (Mem. on Motion for Recusal) (“In terms of propriety, rather than disqualification, I would distinguish quite sharply between a public statement made prior to nomination for the bench, on the one hand, and a public statement made by a nominee to the bench. For the latter to express any but the most general observation about the law would suggest that, in order to obtain favorable consideration of his nomination, he *878 deliberately was announcing in advance, without the benefit of judicial oath, briefs, or argument, how he would decide a particular question that might come before him as a judge.”).
When a candidate is later called upon as a judge to preside over cases involving disputed issues about which he or she has made campaign announcements, the judge is placed in an awkward, if .not impossible, position. Should the judge properly determine, for example, that a law violates the Constitution,' having already expressed this opinion during the campaign, the judge risks appearing as though he or she prejudged the case rather than .gave it due consideration in light of the law, arguments, and facts. This apparent rigidity can undermine the faith of the litigants and public in the judge’s decision and in the State’s judicial system generally. See Stretton, 944 F.2d at 142. On the other hand, should the judge reach a conclusion that departs from the opinion expressed during the campaign, the judge risks being assailed as a dissembler. Thus, the judge may hesitate to decide the case in a way that might lose votes at the next election. Certainly, many judges have the fortitude to resist such pressures, but we do not doubt that the potential of supporter abandonment at the next election can weigh heavily on judges who know they were elected based on representations they made during the last campaign. Cf. The Federalist No. 78, at 471 (Alexander Hamilton) (Clinton Rossiter ed.1961) (arguing against periodic popular election of judges because it gives them “too great a disposition to consult popularity” when rendering decisions).
Wersal does not explain why he believes the canon restricting- candidates from manifesting bias or prejudice inappropriate to judicial office fully protects the State’s interests left unshielded by the ban on candidates making improper pledges and promises, and we conclude it does not. Canon 5(A)(3)(d)(ii) was added to the Code when the Minnesota Supreme Court updated its ethical rules and brought them closer to the 1990 version of the ABA Model Code, some twenty-two years after the announce clause was promulgated; and we do not read the two provisions to address the same conduct. The manifestation of bias provision, fairly read, is directed at words and conduct that display personal animus against persons or groups, such as women or minorities. Even if it could be construed to cover announcements about how a candidate would decide cases if elected, settled rules of statutory interpretation require that we decline to read it in this way. See Radzanower v. Touche Ross & Co., 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) (subsequently enacted law cast in general terms should not be interpreted to supplant one dealing with specific subject unless absolutely necessary to give effect to the language). We therefore reject any implication that the adoption of the manifestation of bias provision rendered the announce clause unnecessary.
Wersal also challenges the sufficiency of the evidence the Boards have put forth to justify this speech restriction. He argues that the State did not fulfill its evidentiary obligation as a matter of law because the Boards did not prove there was any concrete evidence showing the harmfulness of candidates announcing their views in the public record before the Minnesota Supreme Court at the time the court adopted the announce clause. This argument misapprehends the Boards’ evidentiary burden in this case.
In Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 120 S.Ct. 897, 907-08, 145 L.Ed.2d 886 (2000), for example, the Court stated that to sustain a *879 law setting contribution limits, it was enough for the State to adduce evidence substantiating legislative concerns about the actual or perceived corruption associated with large contributions. As we have noted supra, the corroborating evidence included a state senator’s sworn statement that “large contributions have ‘the real capacity to buy votes,’ ” contemporaneous newspaper accounts tending to show public officials were actually corrupted by contributions, and the recent overwhelming passage of a statewide initiative indicating that the majority of .voters had concluded that contribution limits were necessary. Id. None of these items were shown to be part of the public record before the legislature at the time the legislature enacted the law.
Burson v. Freeman, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), provides an example of the type of corroborating evidence that can support a speech restriction subject to strict scrutiny. In Burson, the Court entertained a challenge to a law establishing a 100-foot “campaign-free” zone around polling places that was designed to protect against voter intimidation and election fraud. As evidence showing that the law was necessary, the Court looked to nineteenth century ballot reforms and traced the development of restrictions on election-day electioneering. Id. at 202-05, 112 S.Ct. 1846. It also noted that all fifty States limit access to areas in or around polling places. Id. at 206, 112 S.Ct. 1846. Taken together, this evidence revealed a “widespread and time-tested consensus” about the problems of voter intimidation and voter fraud which corroborated the State’s conclusion that some sort of “campaign-free” zone around voting compartments was necessary. Id.
In this case, the Boards have met their evidentiary burden by offering evidence of widespread and longstanding consensus among members of the bench and bar about the necessity of restrictions on campaign speech that conveys a judicial candidate’s propensity to decide cases in a particular way. Three-quarters of a century ago, the ABA promulgated the nation’s earliest formalized standards of professional conduct for judges, the Canons of Judicial Ethics. Canon 30 provided that a candidate for judicial office “should not announce in advance his conclusions of law on disputed issues to secure class support.” Canon 30 (1924). Developed and drafted by a committee chaired by Chief Justice William Howard Taft and later approved by delegates to the ABA’s 1924 annual meeting, see Jeffery M. Shaman et al., Judicial Conduct and Ethics § 1.02 (3d ed.2000), the canon reflects the views of members of the legal profession as to what ethical restrictions are needed to protect the integrity of the judiciary. Many state courts reached similar conclusions and adopted the ABA Canons for their own jurisdictions, id. at § 1.02 n. 14, including the Minnesota District Judges Association, whose members voted to do so unanimously at a conference in 1950.
In the early 1970s, the ABA committee charged with drafting the Model Code of Judicial Conduct included a restriction on candidate speech similar to the restriction contained in 1924 code. See ABA Model Code of Jud. Conduct Canon 7(B)(1)(c) (1972). The ABA’s 1972 Model Canon 7 is the pattern on which Minnesota’s announce clause is based, and a majority of States that have an elected judiciary promulgated ethical rules prohibiting candidates from announcing their views on disputed legal and political issues. See Patrick M. McFadden, Electing Justice: The Law and Ethics of Judicial Election Campaigns 85 (1990). In 1990, when the ABA revised its Model Code, it adopted a different formulation of the candidate speech restriction, but *880 one that continues to restrict more speech than the pledges-and-promises provision. Model Canon 5 restrains candidates from making “statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court.” ABA Model Code of Jud. Conduct Canon 5(A)(3)(d)(ii) (1990). A number of States have revised their rules in accordance with the 1990 “commitment” canon.[21] Today, most States with an elected judiciary have campaign speech restrictions patterned after either the 1972 or 1990 ABA model canons.[22]
Minnesota Supreme Court decisions such as Moon v. Halverson, 206 Minn. 331, 288 N.W. 579 (1939), and Peterson v. Stafford, 490 N.W.2d 418 (Minn.1992), also provide insight into factors that would have informed the court’s decision to adopt the announce clause. As we have discussed, in both cases Minnesota justices commented on historical problems resulting from close proximity between judicial elections and partisan politics. It is reasonable to infer that the prohibition on candidates announcing their views on disputed issues was intended in part to prevent judicial campaigns from becoming routine political contests, thereby jeopardizing the independence and integrity of the State’s judiciary. This inference is corroborated by evidence showing that the Minnesota Bar Association, District Judges Association, and the Conference of Chief Judges recently recommended against the adoption of the less-restrictive 1990 ABA commitment canon because of concerns that liberalizing Canon 5’s speech restrictions would politicize judicial elections.
The plaintiffs have offered no contradictory evidence which might increase the need for a more extensive showing by the State. See Shrink Mo., 120 S.Ct. at 906. Wersal argues that the Lawyers Board’s refusal to enforce the announce clause calls into question the Boards’ attempt to demonstrate that the clause serves compelling state interests. That the Director of the Lawyers Board stated she would not prosecute violations under the clause as a matter of prosecutorial discretion until it was upheld by a court is not sufficient to increase the evidentiary burden. The Lawyers Board’s determination was based on *881 the likelihood of a constitutional challenge to the announce clause and the limited resources available to the Board for defending such a suit; it has little bearing on whether certain campaign announcements can impair or be perceived to impair judicial independence and impartiality.
The Lawyers and Judicial Boards have shown that this restriction furthers compelling governmental interests in the independence and actual and perceived impartiality of the judiciary.
B.
Having concluded the restriction furthers compelling interests, we must examine whether it is narrowly tailored. See California Democratic Party v. Jones, 530 U.S. 567, 120 S.Ct. 2402, 2414, 147 L.Ed.2d 502 (2000); Brown, 456 U.S. at 54, 102 S.Ct. 1523.
The district court construed the announce clause to apply only to discussion of a candidate’s predisposition on issues likely to come before the candidate if elected into office. Republican Party v. Kelly, 63 F.Supp.2d 967, 986 (D.Minn.1999). None of the plaintiffs claimed in their opening briefs on appeal that the district court erred by interpreting the language as it did. Wersal attempts to raise the issue in his reply brief. It is well established that issues not argued in an opening brief cannot be raised for the first time in a reply brief,[23] and we will therefore analyze the announce clause as it has been construed by the district court. We should add, however, that if the issue were properly before us, we would not find error in the district court’s interpretation. The longstanding principle that courts should construe laws to sustain their constitutionality, see, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), the Minnesota Supreme Court’s adherence to this interpretive principle, see In re R.A.V., 464 N.W.2d 507, 509 (Minn.1991), rev’d on other grounds by R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and the Judicial Board’s endorsement of the narrowed construction form a solid foundation for the district court’s conclusion. Furthermore, the interpretation accords with Stretton, where the Third Circuit interpreted identical language similarly. 944 F.2d at 144.[24]
As construed by the district court, the restriction prohibits candidates only from publicly making known how they would *882 decide issues likely to come before them as judges. A similar construction was determined to be narrowly drawn in Stretton, 944 F.2d at 144, and we are persuaded that it is narrowly drawn here as well. These sorts of campaign announcements are (or can appear to be) calculated to show that the candidate will decide cases in a certain way if elected into office, and the implication that the candidate will carry through with his campaign announcements can haunt the candidate on the bench to the detriment of the State’s judicial system. See id. But see Buckley, 997 F.2d at 229 (questioning whether limiting construction would significantly circumscribe scope of announce clause, giving example of civil war in Yugoslavia as likely to come before courts as persecution defense to deportation).
Wersal has stated that the restriction prohibits candidates from discussing virtually every topic related to their campaigns, and the dissent maintains that it effectively bans all campaigning. But nothing in Canon 5(A)(3)(d)® restricts candidates from discussing or publicizing information about their character, fitness, integrity, background (with the exception of their political affiliation), education, legal experience, work habits, and abilities, which are subjects the Minnesota General Assembly has determined to be highly relevant to a candidate’s qualification for office. See Minn.Stat. § 480B.01, subd. 8 (listing criteria by which commission on judicial selection shall evaluate persons applying for judicial vacancies to be filled by gubernatorial appointment). The Minnesota Supreme Court has also indicated that candidates may discuss and state their views on how they would handle administrative duties if elected. See Bundlie v. Christensen, 276 N.W.2d 69, 72 (Minn.1979) (no ethical violation under Canon 7(B), the precursor to Canon 5(A), when candidate made cutting costs of courtroom administration part of campaign platform); cf. Ackerson v. Kentucky Judicial Ret. & Removal Comm’n, 776 F.Supp. 309, 314 (W.D.Ky.1991) (restraint on campaign speech about court administration would violate First Amendment).
We further believe the Minnesota Supreme Court would conclude that general discussions of case law or a candidate’s judicial philosophy do not fall within the scope of the announce clause. In 1990 the Judicial Board issued an advisory opinion, which the Board has since made known to judicial candidates by letter, stating that Canon 5 does not prohibit candidates from discussing appellate court decisions. See Minnesota Bd. on Judicial Standards, Informal Op. 10/10/1990. The Judicial Board has also approved extensive lists of sample questions that interested voters could pose to judicial candidates consistent with Canon 5. These questions are wide-ranging and include such topics as a candidate’s judicial philosophy, issues relating to the administration of justice in criminal, juvenile, and domestic violence cases, and the candidate’s perception of a judge’s role in the judicial system.
While it is true that some judicial ethics advisory bodies in other States have interpreted language identical to the announce clause to reach topics such as these, see, e.g., Berger v. Supreme Court, 598 F.Supp. 69, 74 (S.D.Ohio 1984) (disciplinary counsel’s position that truthful criticisms of judicial administration and incumbents prohibited); see generally, Patrick M. McFadden, Electing Justice: The La/w and Ethics of Judicial Election Campaigns 86-87 (1990) (collecting advisory opinions stating that discussion of court administration, court rules, criminal sentencing, judicial philosophy, published court decisions, etc. were improper), we believe the Minnesota Supreme Court would view the matter consistently with *883 the Judicial Board. The Judicial Board has been intimately involved with the process of amending the Code over the years, and its views are likely to reflect those of the Minnesota Supreme Court. As the Third Circuit in Stretton put it, “[w]e would be naive not to recognize that the [Judicial Board’s] position is, at the very least, a straw in the wind indicating the direction that [the supreme] court will go.” Stretton, 944 F.2d at 143. Furthermore, some of the advisory opinions of other States’ ethics boards conflict with the Minnesota Supreme Court’s decision in Bundlie on whether the announce clause prohibits announcements about judicial administration.
Wersal cites several decisions in which courts have struck down similar canons as overly broad restrictions on speech. E.g., Buckley, 997 F.2d at 228-29; Beshear v. Butt, 863 F.Supp. 913, 917-18 (E.D.Ark.1994); ACLU v. Florida Bar, 744 F.Supp. 1094, 1097 (N.D.Fla.1990); J.C.J.D. v. R.J.C.R., 803 S.W.2d 953, 956-57 (Ky. 1990). However, these eases proceed on the assumption that judicial candidates are left with little to discuss and to put before the voters other than their “name, rank, and serial number,” Buckley, 997 F.2d at 227, “biographical data,” ACLU v. Florida Bar, 744 F.Supp. at 1098, or “professional history,” J.C.J.D., 803 S.W.2d at 956, and are therefore distinguishable.
The announce clause, as construed by the district court, is narrowly tailored to further compelling governmental interests.
VI.
Wersal contends that Canon 5(B)(2),[25] which prohibits judicial candidates from personally soliciting campaign funds, violates the First Amendment because it is not narrowly tailored.
We have no difficulty in concluding that Canon 5(B)(2) is necessary to serve compelling state interests. Indeed, Wersal does not dispute these points. Raising campaign funds, a practical requirement for judicial candidates who face popular election, has been identified as presenting “the greatest of all conflicts” between necessity and judicial impartiality. See E. Wayne Thode, Reporter’s Notes to Code of Judicial Conduct 98 (ABA 1973). Judges, more than officeholders in other branches of government, risk the appearance that those who contribute to their campaigns can impermissibly influence governmental processes. When judges obtain funds from a group that has an interest in the outcome of litigation, such as the plaintiffs’ or defendants’ bar, judges can appear beholden to that group for their accession to office, creating the expectation that the judges will favor their benefactors accordingly. See In re Fadeley, 310 Or. 548, 802 *884 P.2d 31, 40 (1990) (“A judge’s direct request for campaign contributions offers a quid pro quo or, at least, can be perceived by the public to do so.”); cf. Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 120 S.Ct. 897, 905-06, 145 L.Ed.2d 886 (2000) (public perception that large donors can “call the tune” for candidates can harm democratic processes); Buckley v. Valeo, 424 U.S. 1, 27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Even if judges receive contributions from a broad cross-section of persons and interests, the appearance of impropriety hangs over them if they adjudicate cases in which a litigant or counsel has contributed, or refused to contribute, to their campaign. See Stretton, 944 F.2d at 145 (noting the unseemliness of judges presiding over eases in which lawyers have helped fund judicial campaign chests).
Recognizing the unique difficulties presented by judicial campaign fundraising, Canon 5(B)(2) seeks to insulate judicial candidates from the solicitation and receipt of funds while leaving open ample alternative means for candidates to raise the resources necessary to run their campaigns. To this end, Canon 5(B)(2) provides that candidates may establish campaign committees to conduct fundraising on their behalf. The Code does' not limit the amount individuals can contribute to the candidate’s campaign fund or the amount the campaign committee may raise. Canon 5(B)(2) imposes only two restrictions related to campaign finance on the committee: its members cannot disclose to the candidate the identity of contributors or those who were solicited to contribute but declined, and they cannot permit the campaign funds to be used for private benefit.
Wersal’s objection to this fundraising arrangement is limited: He does not challenge the campaign committee setup or the restrictions placed on the committee’s members. Rather, he suggests that a narrowly tailored rule would allow candidates to solicit funds from large groups and to send out letters over their signatures requesting money. He argues that the State’s concern over the corrupting influence of money on judicial candidates is fully redressed by the provision that prevents the campaign committee from revealing the identity of campaign contributors.
Wersal is correct that the knowledge-screening provision of Canon 5(B)(2) lessens several of the problems attendant on judicial campaign fundraising; we reject his conclusion, however, that it obviates the need for limitations on candidates soliciting funds from groups personally or by letter. When a judicial candidate seeks funds directly from those who stand to gain from the candidate’s decisions in office, the State may conclude that his activity is incongruous with the decorum of judicial office whether or not the candidate is shielded from knowing who ultimately contributed. Particularly when candidates target groups who have pecuniary or ideological interests in litigation likely to come before the court, the mere act of solicitation can contribute to the- appearance, accurate or not, that “justice is for sale” and the expectation of impermissible favoritism. See Fadeley, 802 P.2d at 40.
Wersal makes a secondary argument that when Canon 5(B)(2) deprives him of the opportunity to solicit funds from large groups or by mail it prevents him from running an effective campaign. The Supreme Court has said that restrictions on campaign financing must leave candidates with the ability to accumulate sufficient resources for effective advocacy. Shrink Mo., 120 S.Ct. at 908-09; Buckley, 424 U.S. at 21, 96 S.Ct. 612. Citing the impracticability of his being accompanied by a campaign committee member who could *885 “utter the magic words” to solicit funds, Wersal argues his statewide campaign efforts were frustrated. However, no provision in the Code specifies that members of a campaign committee must request con-, tributions in person. Canon 5(B)(2) expressly permits committees to conduct campaigns through, mailings, brochures, and advertisements. Wersal has not alleged that these alternatives are ineffective fundraising mechanisms. Accordingly, he has not demonstrated that Canon 5’s restrictions stifled his campaign efforts. See also Shrink Mo., 120 S.Ct. at 909 (“a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional under Buckley ”).
In a separate argument, the Party asserts that Canon 5(B)(2) is not.narrowly tailored as applied to third parties. Much of this argument is based on a misreading of a Code section we have already clarified. Canon 5(A)(3)(c), which states that candidates “shall not authorize or knowingly permit any other person to do for the candidate what the candidate is prohibited from doing,” is violated only when persons act as agents of the candidate. As a result, no ethical violations occur if third parties solicit or expend funds independently of Wersal and his campaign com7 mittee.
The district court did not err in determining that this restriction is narrowly tailored to further compelling state interests.
VIL
The judgment of the district court is affirmed.

. The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

. At least in recent times, it has not been the norm in Minnesota for judicial candidates to seek political party endorsements or for political parties to consider endorsing them. The parties submitted no evidence that other judicial candidate campaign committees sought or were considered for such endorsements. In a February 10, 1998 letter, Wersal wrote a newspaper editor that "the Republican Party had never endorsed a judicial candidate before,” and a June 20, 1998 Minnesota newspaper article characterized the Party’s deliberation over whether to endorse Wersal as "a historic break with tradition.” Party endorsements may not have been uncommon early in the twentieth century. See Moon v. Halverson, 206 Minn. 331, 288 N.W. 579, 581-82 (1939) (Loring, J., concurring) (commenting . on recent allegations of party treason directed at judges who issued decisions contrary to endorsing party’s interests).

. These affiliated organizations included the Indian Asian American Republicans, the Republican Seniors, the Young Republicans League of Minnesota, and the Minnesota Col *860 lege Republicans. The Minnesota African American Republican Council and the Muslim Republicans, also affiliated organizations, were later added as plaintiffs.

. Other plaintiffs included Wersal's campaign committee, and Party members Cheryl Wer-sal, Mark Wersal, and Corwin Hulbert. Michael Maxim, another member of the Minnesota Republican Party, and Kevin Kolosky, also a candidate for judicial office in 1996 and 1998, later joined as plaintiffs. Because the Party, its affiliated organizations, and its members Cheryl Wersal, Mark Wersal, and Corwin Hulbert have filed a single brief, we refer only to the Party when addressing their arguments. Likewise, we refer only to Gregory Wersal when addressing his contentions, those of Kolosky, and the campaign committee, who also have submitted a single brief.

. The district court found that the plaintiffs established a likelihood of success on their claim that the announce clause was unconstitutional, but concluded that the State’s interest in maintaining a nonpartisan judicial election weighed against enjoining enforcement qf all of Canon 5. Republican Party v. Kelly, 996 F.Supp. 875, 879-80 (D.Minn.1998).

. For the first time on appeal, the Lawyers and Judicial Boards contend that the plaintiffs who are not candidates for judicial office and cannot be sanctioned by the Boards lack standing to challenge Canon 5. Citing Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), the Boards argue that the plaintiffs' voluntary decisions not to advocate Wer-sal’s candidacy do not constitute'legally cognizable injuries. However, the plaintiffs have alleged more than the subjective “chilling” of their free speech rights held insufficient by the Supreme Court in Tatum, 408 U.S. at 13-14, 92 S.Ct. 2318. Wersal and the other plaintiffs have stated they were unable to associate with each other at political party gatherings and alleged they would have done so absent the ethical restrictions. Deprivation of the right to associate with others politically is a cognizable "injury in fact.” See Lerman v. Board of Elections, 232 F.3d 135, 143 (2d Cir.2000), petition for cert. filed (U.S. Feb. 28, 2001) (No. 00-1360); Krislov v. Rednour, 226 F.3d 851, 858 (7th Cir.2000), cert. denied, U.S. -, 121 S.Ct. 1085, 148 L.Ed.2d 960 (2001) (No. 00-923). Because the plaintiffs' associational injuries are fairly traceable to Canon 5 and the injunctive relief they request will redress them, the plaintiffs have standing to assert their claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (Article III standing requires plaintiffs allege "injury in fact” fairly traceable to defendant's conduct likely to be redressed by favorable court decision); National Solid Waste Management Ass’n v. Williams, 146 F.3d 595, 598 (8th Cir.1998).

. We discuss the claim thát Canon 5 also reaches the conduct of persons who are not judicial candidates infra at 873-75.

. The effects of Canon 5 on speech and associational rights, respectively, are so closely intertwined that, having decided to apply strict scrutiny because of the effects on speech, we need not consider whether the effects on associational rights alone would have called for a less rigorous standard.

.In Minnesota there were two constitutional conventions, one Democratic and one Republican. The two drafts resulting from those conventions were consolidated and then submitted for ratification. Peterson v. Stafford, 490 N.W.2d 418, 420 n. 10 (Minn.1992).

. Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856).

. The Minnesota Supreme Court has thus with great precision and specificity answered the dissent’s rhetorical question, "Independent from what?" Infra at 886.

. Since 1991 a judicial selection commission, which is composed of members appointed by the governor and by the justices of the supreme court, evaluates the merits of applicants for mid-term vacancies and recommends to the governor three to five nominees for each open position. Minn.Stat. §§ 480B.01, subds. 2, 8-11 (1998).

. The dissent concludes that Peterson's use of the phrase "independent ‘as possible,’ ” infra at 891, must be viewed, not in light of Peterson's detailed historical review, but rather in light of the dissent's independent review of Minnesota history. See infra at 886-90. The deference we must give to state court opinions on matters of state law does not allow us to supplant Peterson's considered views in favor of our own de novo interpretation, nor may the dissent. The dissent also states that Canon 5 "subverts” Minnesota's policy, infra at 890, and seemingly presumes that Canon 5 is not part of state law because it emanates from the state supreme court, rather than from the state legislature. No one, including the dissent, has questioned the authority of the Minnesota Supreme Court to promulgate ethical rules for incumbent judges and judicial candidates. The same federalism principles which require us to defer to state courts' interpretations of state law and to recognize that state laws embody the will of a State also dictate that we recognize Canon 5 as a regulation that expresses Minnesota’s will as a sovereign entity. See Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 534, 148 L.Ed.2d 388 (2000) (Rehnquist, C.J., concurring) ("in ordinary cases, the distribution of powers among the branches of a State's government raises no questions of federal constitutional law, subject to the requirement that the government be republican in character”).

. In arguing that the state interests we have identified are not compelling, the dissent relies on Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), in which the State sought to govern not the conduct of judges, but of the press in reporting on judicial disciplinary proceedings. The dissent’s discussion of Landmark Communications suggests that the compelling interest we rely on is protection of judges from criticism. Infra at 897. We rely on the State’s interest in its judges' integrity and independence, which requires keeping judges from doing (or appearing to do) things that compromise their neutrality, rather than keeping others from talking or writing about them. Minnesota seeks not to "shield[] judges from published criticism,” infra at 898 (quoting Bridges v. California, 314 U.S. 252, 270-71, 62 S.Ct. 190, 86 L.Ed. 192 (1941)), but to prevent them from deserving such criticism. Moreover, the Supreme Court in Landmark Communications did not reject the legitimacy of the State's proffered interests in the reputation of its judiciary and the integrity of its disciplinary proceedings, but held that the State had not shown that these interests would be “seriously undermined” unless the State could use criminal sanctions against the defendant newspaper. Id. at 841, 845, 98 S.Ct. 1535.

. Canons 5(A)(1)(a) and (d) provide:
Each justice of the supreme court and each court of appeals and district court judge is deemed to hold a separate nonpartisan office. MS 204B.06 Subd. 6.
(1) Except as authorized in Section 5B(1), a judge or a candidate for election to judicial office shall not:
(a) act as a leader or hold any office in a political organization; identify themselves as members of a political organization, except as necessary to vote in an election.
(d) attend political gatherings; or seek, accept or use endorsements from a political organization ....

. We held the voter initiative imposing contribution limits invalid under the First Amendment in Carver v. Nixon, 72 F.3d 633, 645 (8th Cir.1995); consequently, its restrictions were not in force when Shrink Missouri was decided.

. It is significant that the dissent in this case first argues that the Minnesota Supreme Court has violated the Constitution in enacting Canon 5, and then makes the antithetical assertion that it has not gone far enough.

. E.g., Fla.Code of Jud. Conduct Canon 7(C)(3) (imposing various limits on speaking at political gatherings, including prohibition on announcing party affiliation); Ky. Sup.Ct. R. 4.300, Canon 5(A)(2) (allowing candidate to state party affiliation only in response to direct question); Okla. Stat. Ann. tit. 20, § 1404(B)(6) (West 1991 & Supp.) (making it a ground for removal of judge from office to make party affiliation publicly known in connection with campaign for office); Or.Code of Jud. Conduct JR 4-102, 4-104 and Or.Rev. Stat. § 249.015 (1999) (candidate shall not publicly identify candidate’s political party membership except by registering to vote); S.D.Code of Jud. Conduct Canon 5(C)(l)(a)(ii) (permitting candidate to identify party affiliation only to vote); Wash.Code of Jud. Conduct Canon 7(A)(1)(e) (same).

. Canon 5(A)(3)(d)(i) provides that a judge or á candidate for judicial office shall not:
(i) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; announce, his or her views on disputed legal or political issues; or misrepresent his or her identity, qualifications, present position or other fact, or those of the opponent.

. Wersal also challenges the announce clause as being vague. However, his argument is based solely on the clause's relationship to Canon 5(A)(3), which prevents him from "knowingly permitting]” others to announce his views on his behalf. We have already held supra at 875 that the "knowingly permit” language is not unconstitutionally vague, and we therefore reject this claim. Furthermore, our clarification of the "knowingly permit” language is dispositive of the Party's claim that the announce clause is unconstitutional as applied to third parties. Candidates are subject to discipline only when third parties act as agents of the candidate or have voluntarily assumed a relationship with the candidate as a member of the candidate's campaign committee. The Code does not regulate the independent activities of third parties.

. See, e.g., Ariz. Sup.Ct. R. 81, Canon 5(B)(l)(d)(ii); Ark.Code of Jud. Conduct Canon 5A(3)(d)(ii); Cal.Code of Jud. Ethics Canon 5(B); Fla.Code of Jud. Conduct Canon 7(A)(3)(d)(ii); Ga.Code of Jud. Conduct Canon 7(B)(1)(c); Ill. Sup.Ct. R. 67, Canon 7(A)(3)(d)(i); Kan. Sup.Ct. R. 601A, Canon 5(A)(3)(d)(ii); Ky. Sup.Ct. R. 4.300, Canon 5(B)(1)(c); La.Code of Jud. Conduct Canon 7(B)(l)(d)(ii); N.Y.Code of Jud. Conduct Canon 5(A)(4)(d)(ii); Ohio Code of Jud. Conduct Canon 7(B)(2)(d); S.D. Stat., ch. 16-2, app., Canon 5(A)(3)(d)(ii); Tenn. Sup.Ct. R. 10, Canon 5(A)(3)(d)(ii); Wash.Code of Jud. Conduct Canon 7(B)(l)(c)(ii).

. A few States proscribe only improper campaign pledges and promises. See, e.g., Or. Code of Jud. Conduct JR 4-102(B); Utah Code of Jud. Conduct Canon 5(C)(1). Other States impose different, yet significant speech restrictions. See, e.g., Tex.Code of Jud. Conduct Canon 5(2)(i) (no "indicatfing] an opinion on any issue that may be subject to judicial interpretation by the [judge/candidate if elected into office], except that discussion of an individual’s judicial philosophy is appropriate if conducted in a manner which does not suggest to a reasonable person a probable decision on any particular case”); Wis. Sup. Ct. R. 60.06(3) (prohibiting "suggestions of conduct in office which appeal to the cupidity or partisanship of the electing or appointing power”); see also Ala. Canons of Jud. Ethics Canon 7(B)(1)(c) (candidate "shall not announce in advance the candidate's conclusions of law on pending litigation”); Colo. Code of Jud. Conduct Canon 7(B)(1)(c) (candidate may not "announce how the judge would rule on any case or issue that might come before the judge”).

. See, e.g., United States v. Vincent, 167 F.3d 428, 432 (8th Cir.1999), cert. denied, 528 U.S. 848, 120 S.Ct. 124, 145 L.Ed.2d 105 (1999); South Dakota Mining Ass'n v. Lawrence County, 155 F.3d 1005, 1011 (8th Cir.1998); United States v. Davis, 52 F.3d 781, 783 (8th Cir.1995); French v. Beard, 993 F.2d 160, 161 (8th Cir.1993); see also United States v. Darden, 70 F.3d 1507, 1549 n. 18 (8th Cir.1995) ("Absent some reason for failing to [raise issue in opening brief], we will not consider an issue first raised in a reply brief.”).

. In claiming error, Wersal relies heavily on Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 229-30 (7th Cir.1993) where the Seventh Circuit declined to read an analogous canon narrowly. Having carefully studied both Stretton v. Disciplinary Bd., 944 F.2d 137 (3d Cir.1991), and Buckley, we believe that Stretton is more persuasive. Buckley gives little heed to "our task [as. courts] to construe [laws] so as to comport with constitutional limitations” if consistent with the will of the lawmaker. United States Civil Serv. Comm’n v. National Ass’n of Letter Carriers, 413 U.S. 548, 571, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). Buckley also distinguished Stretton in part due to factors not present in this case or in Stretton: a disciplinary body’s determination that a judge violated the clause when he commented truthfully on his past record and counsel’s convoluted arguments that the announce clause contained an implied "right of reply.” 997 F.2d at 229.

. In full, Canon 5(B)(2) provides:
A candidate shall not personally solicit or accept campaign contributions or solicit publicly stated support. A candidate may, however, establish committees to conduct campaigns for the candidate through media advertisements, brochures, mailings, candidate forums and other means not prohibited by law. Such committees may solicit and accept campaign contributions, manage the expenditure of funds for the candidate's campaign and obtain public statements of support for his or her candidacy. Such committees are not prohibited from soliciting and accepting campaign contributions and public support from lawyers, but shall not seek, accept or use political organization endorsements. Such committees shall not disclose to the candidate the identity of campaign contributors nor shall the committee disclose to the candidate the identity of those who were solicited for contribution or stated public support and refused such solicitation. A candidate shall not use or permit the use of campaign contributions for the private benefit of the candidate or others.