# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4021

_____

| | | |
|---|---|---|
| Republican Party of Minnesota, an association; Indian Asian American Republicans of Minnesota, an association; Republican Seniors, an association; Young Republican League of Minnesota, a Minnesota nonprofit corporation; Minnesota College Republicans, an association, | * * * * * * * * * | |
| Plaintiffs - Appellants, | * | |
| | * | Appeals from the United States |
| Gregory F. Wersal, individually, | * | District Court for the |
| | * | District of Minnesota. |
| Plaintiff, | * | |
| | * | |
| Cheryl L. Wersal, individually; Mark E. Wersal, individually; Corwin C. Hulbert, individually, | * * * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | |
| Campaign for Justice, an association, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Minnesota African American Republic Council, an association, | * * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| Muslim Republicans, an association; | * | |

Michael Maxim, individually; Kevin J.     *
Kolosky, individually,     *

        *

    Plaintiffs,     *

        *

    v.     *

        *

Suzanne White, in her capacity as     *
Chairperson of the Minnesota Board of     *
Judicial Standards, or her successor;     *
Edward J. Cleary, in his capacity as     *
Director of the Minnesota Office of     *
Lawyers Professional Responsibility, or     *
his successor; Charles E. Lundberg,     *
in his capacity as Chair of the     *
Minnesota Lawyers Professional     *
Responsibility Board, or his     *
successor,     *

        *

    Defendants - Appellees,     *

        *

Minnesota Civil Liberties Union,     *

        *

    Amicus on Behalf of Appellant,     *

        *

The Minnesota State Bar Association,     *

        *

    Amicus on Behalf of Appellee.     *

        *

_____

No. 99-4025
_____

Republican Party of Minnesota, an     *
association; Indian Asian American     *
Republicans of Minnesota, an     *

association; Republican Seniors, an     *
association; Young Republican League   *
of Minnesota, a Minnesota nonprofit    *
corporation; Minnesota College        *
Republicans, an association; Minnesota   *
African American Republic Council, an   *
association; Cheryl L. Wersal,        *
individually; Mark E. Wersal,       *
individually; Corwin C. Hulbert,     *
individually; Gregory F. Wersal,     *
individually; Campaign for Justice, an   *
association; Muslim Republicans, an    *
association,                        *
                            *

      Plaintiffs,            *
                            *

Michael Maxim, individually,       *
                            *

      Plaintiff - Appellant,     *
                            *

Kevin J. Kolosky, individually,     *
                            *

      Plaintiff,             *
                            *

      v.                     *
                            *

Suzanne White, in her capacity as     *
Chairperson of the Minnesota Board of   *
Judicial Standards, or her successor;    *
Edward J. Cleary, in his capacity as    *
Director of the Minnesota Office of     *
Lawyers Professional Responsibility, or   *
his successor; Charles E. Lundberg, in   *
his capacity as Chair of the Minnesota   *
Lawyers Professional Responsibility    *
Board, or his successor,          *
                            *

Defendants - Appellees,      *

          *

The Minnesota State Bar Association,  *

          *

Amicus on Behalf of Appellee.    *

_____

No. 99-4029

_____

Republican Party of Minnesota, an     *
association; Indian Asian American    *
Republicans of Minnesota, an       *
association; Republican Seniors, an    *
association; Young Republican League  *
of Minnesota, a Minnesota nonprofit   *
corporation; Minnesota College     *
Republicans, an association,       *

          *

    Plaintiffs,         *

          *

Gregory F. Wersal, individually,    *

          *

    Plaintiff - Appellant,    *

          *

Cheryl L. Wersal, individually; Mark E. *
Wersal, individually; Corwin C. Hulbert,*
individually;          *

          *

    Plaintiffs,         *

          *

Campaign for Justice, an association;  *

          *

    Plaintiff - Appellant,    *

          *

Minnesota African American Republic  *

Council, an association; Muslim       \*
Republicans, an association; Michael    \*
Maxim, individually;                     \*
                                             \*
       Plaintiffs,               \*
    \*
Kevin J. Kolosky, individually,      \*
    \*
       Plaintiff - Appellant,      \*
    \*
       v.                        \*
    \*
Suzanne White, in her capacity as    \*
Chairperson of the Minnesota Board of   \*
Judicial Standards, or her successor;   \*
Edward J. Cleary, in his capacity as    \*
director of the Minnesota Office of     \*
Lawyers Professional Responsibility, or \*
his successor; Charles E. Lundberg, in   \*
his capacity as Chair of the Minnesota   \*
Lawyers Professional Responsibility    \*
Board, or his successor,            \*
    \*
       Defendants - Appellees,     \*
    \*
The Minnesota State Bar Association,    \*
    \*
       Amicus on Behalf of Appellants.   \*

_____

Submitted: December 10, 2002

Filed: March 16, 2004
_____

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

In Republican Party of Minnesota v. White, 536 U.S. 765 (2002), the Supreme Court reversed the grant of summary judgment against Gregory Wersal and the other plaintiffs in this suit on their claim that the "announce" clause of Canon 5 of the Minnesota Code of Judicial Conduct violated their First Amendment rights. The Supreme Court remanded to us for further proceedings consistent with its opinion. Id. at 788. We conclude that the Supreme Court's opinion requires us to remand to the district court for entry of judgment in favor of Wersal and the other plaintiffs on their "announce" clause claim. We remand to the district court for consideration of whether its disposition of the plaintiffs' claims based on restriction of partisan activities is consistent with the Supreme Court's opinion. Finally, we remand to the district court for entry of judgment in favor of Suzanne White and the other defendants on plaintiffs' personal solicitation clause claim.

We stated the facts of this case in our earlier opinion, Republican Party of Minnesota v. Kelly, 247 F.3d 854 (8th Cir. 2001), and need not belabor them here, except to say that Wersal was a candidate for election to the Minnesota Supreme Court, who challenged several provisions of Canon 5. Canon 5 prohibits candidates for judicial office from announcing their views on disputed legal and political issues, from engaging in specific partisan political activities, and from personally soliciting campaign contributions. Wersal, together with other plaintiffs associated with his

campaign[1] and the state Republican party and affiliated organizations,[2] filed this suit against the Minnesota Lawyers Professional Responsibility Board[3] and the Minnesota Board of Judicial Standards[4] to enjoin enforcement of Canon 5.  The district court granted summary judgment to the Lawyers Board and the Judicial Board, holding that each challenged provision of Canon 5 survived First Amendment scrutiny. Republican Party of Minn. v. Kelly, 63 F. Supp.2d 967 (D. Minn. 1999).  Wersal and the other plaintiffs appealed.

We affirmed the district court with regard to each of the challenged provisions of Canon 5.  247 F.3d at 885.  We subjected the provisions of Canon 5 to strict scrutiny, asking whether the restrictions were narrowly tailored to serve a compelling state interest.  Id. at 864.  We held that the state had compelling interests in protecting the independence and quality of its judiciary, and in preserving public confidence in the judiciary's independence.  Id. at 864-68.  We held that the state had shown the required quantum of evidence that each of those interests was threatened by the

_____

[1]Other plaintiffs associated with Wersal were his campaign committee and Republican Party members Cheryl Wersal, Mark Wersal, and Corwin Hulbert. Later, Michael Maxim, who was also a member of the Minnesota Republican Party, and Kevin Kolosky, who was another candidate for judicial office, joined as plaintiffs.

[2]The affiliated organizations were the Indian Asian American Republicans, the Republican Seniors, the Young Republicans League of Minnesota, and the Minnesota College Republicans.  The Minnesota African American Republican Council and the Muslim Republicans were later added as plaintiffs.

[3]Named as defendants were the Director of the Minnesota Office of Lawyers Professional Responsibility and the Chair of the Minnesota Lawyers Professional Responsibility Board.  The Professional Responsibility Board supervises the Office of Lawyers Professional Responsibility, which investigates and prosecutes ethical violations by lawyer candidates for judicial office.

[4]The actual defendant named was the Chairperson of the Minnesota Board of Judicial Standards.  The Board of Judicial Standards enforces the Minnesota Code of Judicial Conduct against judges.

practices that Canon 5 regulated. Id. at 868-72 (partisan activity restrictions); 876-81 (announce clause); 883-84 (solicitation restrictions). We then held that each of the challenged restrictions was narrowly tailored to serve the interests of judicial independence and quality. Id. at 872-76 (partisan activity restrictions); 881-83 (announce clause); 884-85 (solicitation restrictions).

Wersal and the other plaintiffs filed a petition for certiorari presenting three questions:

> 1. Whether the provision of the Minnesota Code of Judicial Conduct that prohibits a candidate for elective judicial office from "announc[ing] his or her views on disputed legal or political issues" unconstitutionally impinges on the freedom of speech as guaranteed by the First and Fourteenth Amendments to the United States Constitution.
> 2. Whether the severe burdens imposed by various provisions of the Minnesota Code of Judicial Conduct unconstitutionally impinge on the right of political parties to endorse candidates for elective judicial office in violation of the freedom of speech, freedom of association, and equal protection of law as guaranteed by the First and Fourteenth Amendments to the United States Constitution.
> 3. Whether the provision of the Minnesota Code of Judicial Conduct that forbids a candidate for elective judicial office from attending or speaking at any political party gathering–while permitting such a candidate to attend or speak at gatherings of all other organizations–unconstitutionally impinges on the freedom of speech, freedom of association, and equal protection of the law as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

The petition did not include a question relating to the solicitation restrictions. The Supreme Court granted certiorari, limited to the first question presented, the challenge to the announce clause.

Justice Scalia's opinion for the Supreme Court asked first whether the Boards had identified a compelling state interest to be served by the announce clause. 536

U.S. at 775-84. Justice Scalia considered the terms "judicial independence" and "impartiality" to be insufficiently refined, and he divined three distinct meanings for "impartiality." First, the "root meaning" of impartiality "is the lack of bias for or against either party to the proceeding." Id. at 775 (emphasis in original). Although Justice Scalia implicitly approved this meaning of impartiality as a compelling state interest, he concluded that the announce clause was not narrowly tailored to serve that interest and in fact was "barely tailored to serve that interest at all, inasmuch as it does not restrict speech for or against particular parties, but rather speech for or against particular issues." Id. at 776 (emphasis in original)

The second possible meaning of impartiality was "lack of preconception in favor of or against a particular legal view." Id. at 777 (emphasis in original). Justice Scalia not only rejected this concept as a compelling state interest, but he considered this sort of impartiality undesirable in a judge. Id. ("avoiding judicial preconceptions on legal issues is neither possible nor desirable"). As defined by Justice Scalia, this second meaning of impartiality refers not to a candidate's public actions, but to his or her thoughts. An important point that is not explicit in the Supreme Court opinion is that a restriction on a judicial candidate's speech would be patently ineffective in regulating the candidate's thoughts, even if the state wanted to do so.

The third possible meaning of impartiality was "open-mindedness" or willingness to consider all arguments. "This sort of impartiality seeks to guarantee each litigant, not an equal chance to win the legal points in the case, but at least some chance of doing so." Id. (emphasis in original). This "open-mindedness" meaning of impartiality appears to be intimately related to the second meaning, lack of preconceptions; whereas the second meaning refers to the judge's view of the substantive issue, the third meaning refers to the judge's attitude toward reconsidering his or her view of the substantive issue. Justice Scalia reserved judgment on whether this third sort of impartiality in a judicial candidate was desirable (not to mention compelling) because he considered the announce clause to be so ineffective a way to

achieve "open-mindedness" that this could not have been the state's purpose in adopting the clause. Id. at 780 ("As a means of pursuing the objective of open-mindedness that respondents now articulate, the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous.").

Having rejected the state interests offered by the Boards to justify Canon 5, the Court held: "The Minnesota Supreme Court's canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment. Accordingly, we reverse the grant of summary judgment to respondents and remand the case for proceedings consistent with this opinion." Id. at 788.

The first issue we must decide is what instructions to issue with regard to the announce clause. Then, we must decide whether to instruct the district court to reconsider its grant of summary judgment with regard to the partisan activity and solicitation clauses.

I.

The Supreme Court's reversal of the grant of summary judgment for the defendants on the announce clause issue technically leaves open the question of what to do with the plaintiffs' cross-motion for summary judgment. The plaintiffs ask us to remand with instructions to enter judgment for them, and the Boards do not dispute the propriety of this request. Therefore, the district court should enter judgment for the plaintiffs on Count II of their Second Amended Complaint.

II.

Wersal and the other plaintiffs also ask us to reverse the entry of judgment for the Boards and to order entry of judgment in favor of the plaintiffs on the other four

counts of their complaint, none of which were before the Supreme Court. The Boards argue that we do not have jurisdiction over the issues as to which the plaintiffs did not seek certiorari (solicitation clause) or as to which the Supreme Court denied certiorari (partisan activity clauses).

When the Supreme Court remands a case to us, we must determine whether the law of the case doctrine applies to issues the Supreme Court did not decide. See Madison v. IBP, Inc., 330 F.3d 1051, 1059 (8th Cir. 2003). The law of the case doctrine dictates that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 610 (8th Cir. 1999) (quotation marks omitted). The doctrine does not apply "when an intervening decision from a superior tribunal clearly demonstrates the law of the case is wrong." Id. (quotation marks omitted); Madison, 330 F.3d at 1059; Morris v. American Nat'l Can Corp., 988 F.2d 50, 52 (8th Cir. 1993). Where the Supreme Court's reasoning in disposing of one issue in a case affects the validity of our earlier disposition of other issues in the same case, we will reconsider those issues on remand.[5] See Shrink Missouri Gov't PAC v.

---

[5]The dissent argues that we err in taking into consideration the law of the case doctrine in determining the disposition of issues as to which the Supreme Court did not grant certiorari and which are not discussed in the Supreme Court's opinion in White. In our opinion, we conclude that we must reconsider those issues to determine if the reasoning of our earlier disposition survives the new Supreme Court decision. The dissent takes exception to the words "clearly demonstrates the law of the case is wrong," (quoted in Madison, 330 F.3d at 1059). This phrase does not insulate a purely legal question from de novo review. The word "clearly" in this context does not refer to "clear error" review, which applies to questions of fact, Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985), but to whether the new decision actually has a bearing on other issues in this case that were not directly addressed by the superior tribunal. We do not "defer" to our earlier opinion, as the dissent contends. Where the Supreme Court's reasoning casts doubt on our earlier conclusions, we revisit them, see section IV, infra; where the earlier reasoning is not inconsistent with White, there is no reason to alter it, see section V, infra.

Adams, 204 F.3d 838, 840 (8th Cir. 2000). The law of the case doctrine is discretionary, not jurisdictional. Arizona v. California, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."); Conrod v. Davis, 120 F.3d 92, 95 (8th Cir. 1997).

The cases the Boards cite to show we lack power to reconsider the partisan activity and solicitation clauses are inapposite. In Patterson v. City of Newport News, 364 F.2d 816, 817-18 (4th Cir. 1966), plaintiffs sought to relitigate in federal court a condemnation that had been litigated to final judgment in state court. This was barred as a matter of issue preclusion, not law of the case. In Fleming v. Lake Delton Dev. Co., 267 F.2d 254, 256 (7th Cir. 1959), the court did not decide whether res judicata or law of the case applied, but declined to reconsider the same arguments and the same issues the appellant had already fully litigated. There was no suggestion that the law had changed between the first disposition and the later appeal, as the plaintiffs argue happened in this case.

The Boards also argue that the Supreme Court's remand limited our jurisdiction, citing Hermann v. Brownell, 274 F.2d 842, 843 (9th Cir. 1960). Hermann "stands only for the proposition that upon remand the jurisdiction of an appellate court is limited to those particularized points which were assigned for consideration, if the mandate was in that form." Sanders v. John Nuveen & Co., 554 F.2d 790, 793-94 (7th Cir. 1977) (emphasis added). When a remand does not contain such a limitation, "[o]ther issues not within the compass of the mandate are thereby not precluded from consideration." Id. at 794. The remand in this case stated:

> The Minnesota Supreme Court's canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment. Accordingly, we reverse the grant of summary judgment to respondents and remand the case for proceedings consistent with this opinion.

-12-

536 U.S. at 788. This is the language of a general remand, <u>Field v. Mans</u>, 157 F.3d 35, 42 (1st Cir. 1998), and it does not contain an express or implicit limitation on our jurisdiction of issues that were before us prior to the grant of certiorari, <u>id.</u>

The question before us, then, is whether the Supreme Court's decision demonstrates that the law applied by this court or by the district court in deciding the partisan activity or solicitation clause issues was wrong.

### III.

In our examination of the partisan activity restrictions, we did not suppose that the restrictions were meant to avoid judicial bias for or against particular parties to the suit, as for instance, if the Republican Party were an actual party to litigation before a judge who was endorsed by the Party or who had announced membership in the Party during his election campaign. Recusal of the judge in such a situation is an obvious less restrictive alternative. Therefore, it does not appear that the partisan activity restrictions would be narrowly tailored to avoid impartiality in Justice Scalia's first sense of the word.

Nor did we, in our earlier opinion, consider whether the partisan activity restrictions tended to avoid election of judges who harbored preconceptions about legal issues and to encourage election of judges whose brains were a <u>tabula rasa</u> devoid of experience or opinion. Therefore, we did not base our decision upon vindication of the state's interest in impartiality in Justice Scalia's second sense of the word.

Instead, we focused on what we can now recognize as impartiality in Justice Scalia's third sense of the word: open-mindedness. Moreover, we focused not on lack of open-mindedness in the sense of obstinacy or dogmatism, which are subjective states of mind, but rather on the objectively ascertainable threat to open-mindedness

-13-

that results from having incurred obligations to entities who, while not actually parties to a case, have made known their desire to see certain cases decided in certain ways. Throughout our discussion of the restrictions on partisan activities, we stressed the possibility that candidates who became indebted to political parties could be or seem to be bound to rule in accord with those parties' platforms, rather than in accord with the record and the law.[6] See, e.g., 247 F.3d at 870 (citing concurrence in Moon

---

[6]Our focus on the effect of a candidate's obligation to and dependence on a political party explains why we arrive at a different result than the Northern District of New York, which recently invalidated a portion of the New York Code of Judicial Conduct that prohibited judicial candidates from participating in partisan political activity except for their own campaigns. Spargo v. New York State Comm'n on Judicial Conduct, 244 F. Supp.2d 72 (N.D.N.Y. 2003), vacated for abstention, 351 F.3d 65 (2d Cir. 2003). That court opined: "The only conceivable connection [between the prohibition and judicial independence] would be that engaging in political activity, whether partisan or nonpartisan, would influence a judge's decision toward or against the view espoused, whether it be on an issue of law or as to a party to a proceeding." Id. at 88. Although Spargo's reasoning is quite brief, it appears to conclude that the only possible interests served by the code sections are either lack of preconceptions as to issues of law, which the Supreme Court disapproved in White, or lack of bias as to a party, which could be better addressed by recusal. Id. at 88-89. This reasoning ignores the threat to the interest in open-mindedness resulting from the reality or the appearance of obligation to and dependence on political parties. Spargo may have omitted discussion of this interest because New York, unlike Minnesota, has partisan judicial elections, N.Y. Election Law § 6-106 (McKinney 2003), and one could argue that it makes little sense to prohibit partisan political activity by judicial candidates where the State has chosen to tolerate partisan judicial elections. Minnesota, in contrast, has chosen to make its judicial elections nonpartisan, thus demonstrating its concern with the effect of political parties on judicial impartiality. See Peterson v. Stafford, 490 N.W.2d 418, 422 (Minn. 1992).

The New York Court of Appeals disagreed with Spargo and upheld the New York restrictions on political activity by judicial candidates as narrowly tailored to serve compelling state interests. In the Matter of Raab, 793 N.E.2d 1287, 1292-93 (N.Y. 2003).

v. Halverson, 288 N.W. 579, 581 (Minn. 1939), deploring "accusations of party treason which have been heaped upon some judges in the recent past because of decisions thought to be contrary to the interests of an indorsing party"); 247 F.3d at 872 ("The Minnesota Supreme Court has attempted to prevent judicial candidates from incurring, or seeming to incur, debts to political parties that could compromise their independence. . . ."); id. at 876 ("If the judiciary is then expected to review . . . legislation neutrally, a State may conclude that it is crucial that the judges not be beholden to a party responsible for enactment of the legislation, or to one that opposed it."); id. (Political parties "are simply in a better position than other organizations to hold a candidate in thrall."). In its most extreme form, this kind of threat to open-mindedness goes by the name "bribery," which, of course, is forbidden by laws other than Canon 5, and is unquestionably within the state's power to proscribe. We do not mean to suggest that political endorsements are comparable to the payment of money or could be regulated in the same way. However, the underlying problem of candidates for public office incurring obligations which interfere with their performance in office has been recognized as an urgent threat that governments can remedy, even when the problem takes more subtle forms than bribery. See McConnell v. FEC, 124 S. Ct. 619, 660-61 (2003) (corruption and appearance of corruption extend beyond bribery to other arrangements which create "sense of obligation" in officeholders); Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 389 (2000) ("In speaking of 'improper influence' and 'opportunities for abuse' in addition to 'quid pro quo arrangements,' we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money to 'influence governmental action' in ways less 'blatant and specific' than bribery."); see also United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 565 (1973) (upholding restraints on executive branch employees' political activities because such activities posed "hazards to fair and effective government."). The partisan activity restrictions of Canon 5 are aimed

at forms of obligation which are more subtle than outright corruption, but which the state still has a compelling interest in avoiding in its judiciary.

The Supreme Court left open the possibility that open-mindedness in judicial candidates might be a compelling state interest, so a decision premised upon such an interest has not been shown to be wrong, see Kinman, 171 F.3d at 610. After the decision in White, the New York Court of Appeals entertained a First Amendment challenge to a section of its Rules Governing Judicial Conduct that prohibited judicial candidates from making certain pledges and promises about their future conduct in office. The New York court applied strict scrutiny and upheld the section based, in part, on New York's compelling interest in open-mindedness. In re Watson, 794 N.E.2d 1, 7 (N.Y. 2003) (per curiam) ("[O]penmindedness is central to the judicial function for it ensures that each litigant appearing in court has a genuine–as opposed to illusory–opportunity to be heard.")

Although an analysis based on the compelling interest in judicial open-mindedness is not contrary to White, another aspect of our analysis of the partisan activity clauses must be reexamined carefully. The Supreme Court held that the announce clause would have been a "woefully underinclusive" method of achieving the goal of electing open-minded judges, and so the announce clause could not be said to be narrowly tailored to serve this goal. 536 U.S. at 780. It therefore behooves us to look closely at whether the partisan activity clauses are similarly underinclusive.

Our earlier opinion's discussion of the partisan activity clauses, unlike our discussion of the announce clause, specifically addressed the issue of underinclusiveness in a dialogue with the dissent. Compare 247 F.3d at 871-72 with 247 F.3d at 899-902. The dissent contended that, because Canon 5 prohibited a candidate from participating in the three specified activities with political parties, but not with other organizations that took an interest in how a candidate would decide certain cases if elected, Canon 5 was fatally underinclusive. 247 F.3d at 900-01. We

responded that underinclusiveness is not a ground in its own right for invalidating a law, but that it frequently points to two other defects that are fatal: underinclusiveness may show that the government's interest is not truly compelling, since the government has chosen to leave unchecked a threat to that interest; or else it may show that the government is discriminating on the basis of content, suppressing disfavored speech, while allowing other, favored speech even though it ought to be subject to the same objection as the prohibited speech. 247 F.3d at 871 (citing City of Ladue v. Gilleo, 512 U.S. 43, 51-53 (1994)). To disprove the existence of this first defect, the government defending a law must "establish the empirical reality of the problems it purports to be addressing." 247 F.3d at 871 (quoting Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 493 (1997) (Souter, J., dissenting)); see generally Interactive Digital Software v. St. Louis County, 329 F.3d 954, 959 (8th Cir. 2003) (For measure to pass strict scrutiny, government defending measure must present substantial supporting evidence of harm.).

To disprove the possibility of content discrimination, the government must show that the speech it has burdened poses a different, more serious threat to its asserted interest than the speech it chose not to regulate. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 215 (1975) ("[E]ven a traffic regulation cannot discriminate on the basis of content unless there are clear reasons for the distinctions."). For instance, in Austin v. Michigan State Chamber of Commerce, 494 U.S. 652 (1990), Michigan restricted the political expenditures of corporations in support of or opposition to candidates for state office. The compelling interest for such regulation was the concern that entities that amassed wealth in the economic marketplace would parlay that wealth into "unfair advantage in the political marketplace," 494 U.S. at 670 (Brennan, J., concurring) because their ability to spend corporate money bore no relation to political support for the ideas the corporations spent their money to promote, id. at 659-60, 670, 672. The Chamber of Commerce attacked the Michigan law as underinclusive because it did not regulate expenditures by unincorporated labor unions, which also amassed political war chests. Id. at 665.

The Court noted that federal law restricted expenditures by unions, as well as by corporations, id. at 665 n.4.[7]

Austin rejected the underinclusiveness challenge, reasoning that the corporations enjoyed greater government-conferred legal advantages enhancing their ability to accumulate wealth. 494 U.S. at 665. These legal advantages of corporate form made a crucial distinction between corporations and unions. Additionally, case law permitted union members to opt out of contributing to the union's political activities, which meant that "the funds available for a union's political activities more accurately reflects members' support for the organization's political views than does a corporation's general treasury." Id. at 666. The Michigan law therefore passed strict scrutiny. Cf. Burson v. Freeman, 504 U.S. 191, 207 (1992) (also upholding law on strict scrutiny review against underinclusiveness challenge that law failed to regulate all speech posing same threat; Court reasoned that only the type of speech subject to regulation had been shown to pose threat to compelling interest: "The First Amendment does not require States to regulate for problems that do not exist."); Florida Star v. B.J.F., 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring in judgment) (underinclusiveness fatal where unregulated speech would cause victim discomfort "at least as great" as that caused by speech that was banned).

Our analysis of the problem of underinclusiveness in applying strict scrutiny finds strong support in the Supreme Court's most recent campaign finance case,

---

[7]The Court had discussed in earlier cases a long history of Congressional attempts to address the "war chest" problem posed by corporations and labor unions. See FEC v. Nat'l Right to Work Comm., 459 U.S. 197, 208-09 (1982) (Federal laws accounting for "particular legal and economic attributes of corporations and labor organizations" reflect "a permissible assessment of the dangers posed by those entities to the electoral process."); accord FEC v. Beaumont, 123 S. Ct. 2200, 2206 (2003) (including labor unions in discussion of policies behind regulating corporate campaign contributions); McConnell v. FEC, 124 S. Ct. 619, 644-45 (2003) (same).

McConnell v. FEC, 124 S. Ct. 619, 694-98 (2003). In McConnell, the Court considered a challenge to section 203 of the Bipartisan Campaign Reform Act of 2002, which in turn amended section 316(b)(2) of the Federal Election Campaign Act of 1971, to prohibit use of corporations' and unions' treasury funds to pay for election advertising. 124 S. Ct. at 695 & n.87. Because the provision restricted campaign expenditures, it had to be tested by strict scrutiny. Id. at 695 (asking whether "compelling governmental interest justifies" measure); id. at 766 (Kennedy, J., dissenting) ("All parties agree strict scrutiny applies [to section 203]."). The plaintiffs contended that the section was underinclusive because it did not apply to election advertising in the print media or on the Internet. Id. at 697. The Court held that the evidence in the case supported the conclusion that television advertising posed the greater threat, and therefore the "record amply justifie[d] Congress' line drawing." Id. The Court said that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Id. (quoting Buckley v. Valeo, 424 U.S. 1, 105 (1976)). McConnell thus confirms our earlier reasoning that the sort of underinclusiveness that is fatal in strict scrutiny is irrational underinclusiveness, not underinclusiveness that results from attempting to focus the restriction on only the severest form of the threat to a compelling governmental interest.

Although our method of analysing the underinclusiveness issue remains valid, we must examine whether the actual application was affected by anything in the White decision. The Supreme Court's discussion of the announce clause affected both the necessity and narrow tailoring aspects of our determination that the partisan activity clauses passed strict scrutiny. First, our determination that the Boards had shown the necessity of the restrictions depended partly on our view of the history of Minnesota's effort to extricate its judiciary from partisan pressures, initially by designating judicial elections as non-partisan, and later by adopting Codes of Judicial Conduct restricting partisan activities. 247 F.3d at 869-70. We concluded that "'a

long history, a substantial consensus, and simple common sense' combine to show that regulation is necessary to protect the institution of the judiciary from the dangers of partisanship and corruption." Id. at 870-71 (quoting Burson, 504 U.S. at 211). However, the Supreme Court rejected our reliance on similar considerations supporting the announce clause. 536 U.S. at 785 ("The practice of prohibiting speech by judicial candidates on disputed issues, however, is neither long nor universal."). Moreover, the Court's discussion included language that has obvious relevance to the history of the partisan activity clauses. Id. at 786 ("Thus, not only were judicial candidates (including judges) discussing disputed legal and political issues on the campaign trail [throughout the 19th and first quarter of the 20th centuries], but they were touting party affiliations and angling for party nominations all the while."). Therefore, it is necessary to reconsider whether the partisan activities clauses are supported by sufficient evidence of necessity, without the reliance we placed on the history of Minnesota's efforts to protect its judiciary from partisan pressures.

Second, our conclusion that the Minnesota Supreme Court was justified in regulating candidate speech concerning political parties, while leaving unregulated comparable speech concerning single issue groups depended in part on the existence of the announce clause. 247 F.3d at 876 ("At the Minnesota Supreme Court's 1997 hearing on amending Canon 5, DePaul Willette, Executive Secretary of the Judicial Board, testified that the danger of judicial candidates affiliating with single-issue interest groups was adequately addressed by the provision of Canon 5 prohibiting announcement of the candidate's views on disputed legal or political issues."). Therefore, the evidence supporting Minnesota's distinction between political and other organizations must be reevaluated in light of the demise of the announce clause.

Third, our original underinclusiveness analysis discussed only whether the partisan activity restrictions were underinclusive because they reached speech pertaining to political parties, but not other organizations. We concluded the

distinction between burdened speech and non-burdened speech was justified because political parties posed a more pervasive threat to judicial independence than did other types of organizations. 247 F.3d at 872, 875-76. Cf. McConnell, 124 S. Ct. at 686 ("Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation. Interest groups do not select slates of candidates for elections. Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses. Political parties have influence and power in the legislature that vastly exceeds that of any interest group.") (citation omitted).

The Supreme Court's opinion raised an entirely different underinclusiveness objection:

> The short of the matter is this: In Minnesota, a candidate for judicial office may not say "I think it is constitutional for the legislature to prohibit same-sex marriages." He may say the very same thing, however, up until the very day before he declares himself a candidate, and may say it repeatedly (until litigation is pending) after he is elected. As a means of pursuing the objective of open-mindedness that respondents now articulate, the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous.

536 U.S. at 779. This type of underinclusiveness analysis looks at whether banning certain communications within one time-frame but not another is arbitrary. The same analysis could be applied to other clauses of Canon 5, such as the party identification and attendance at party gatherings clauses. (The endorsement clause only makes sense during the time-frame of an election.) This particular underinclusiveness question was not briefed either before the district court or before us when we decided this case the first time. The plaintiffs ought not to be barred from making a new

argument based on the intervening Supreme Court decision, see Morris v. Am. Nat'l Can Corp., 988 F.2d at 52 (litigant who did not raise argument on first appeal "got lucky" when Supreme Court case changed law before its case became final), but neither should the Boards be prevented from marshaling whatever evidence they choose to present on this issue, as they asked to do at oral argument on remand from the Supreme Court. We therefore remand to the district court to receive new evidence and to determine whether the partisan activity clauses can survive strict scrutiny in light of the Supreme Court's opinion.

IV.

The plaintiffs contended that the solicitation clause of Canon 5 was not narrowly tailored in that it unnecessarily prohibited candidates from soliciting contributions from large groups and sending out fund-raising letters over their own signatures. 247 F.3d at 883-84. We held that personal solicitation by candidates could create the impression that justice is for sale and Canon 5 left a candidate sufficient means by which to raise funds. Id. at 884-85. Plaintiffs did not seek certiorari on this issue. We conclude, however, that failure to seek certiorari on the issue does not now preclude the plaintiffs from asking for reconsideration of the issue in light of the Supreme Court's opinion. See Morris v. American Nat'l Can Corp., 988 F.2d 50, 52 (8th Cir. 1993).

As with the partisan activities clauses, our consideration of Canon 5's restriction on personal solicitation was also premised on the state's interest in a kind of open-mindedness-- keeping candidates free from obligations that would hamper their ability to decide the law according to their own judgment, rather than in accordance with implicit obligations to their financial benefactors. We said: "When judges obtain funds from a group that has an interest in the outcome of litigation, such as the plaintiffs' or defendants' bar, judges can appear beholden to that group for

-22-

their accession to office, creating the expectation that the judges will favor their benefactors accordingly." 247 F.3d at 883. We cannot, then, say that our opinion was wrong in discerning a compelling state interest served by the personal solicitation restriction.

We considered whether the personal solicitation restriction was narrowly tailored in our original opinion. Id. at 884-85. Nothing in the Supreme Court's opinion discredits our analysis of this issue. Cf. In re Dunleavy, 838 A.2d 338, 350-51 (Me. 2003) (upholding restriction on judges' solicitation of support for political candidates after White as narrowly tailored), pet'n for cert. filed (Jan. 20, 2004) (No. 03-1132). Our holding on the issue is therefore not wrong. The plaintiffs cite the Eleventh Circuit's opinion in Weaver v. Bonner, 309 F.3d 1312, 1322-23 (11th Cir. 2002), invalidating Georgia Canon of Judicial Conduct 7(B)(2), which prohibited judicial candidates from personally soliciting campaign contributions. The Canon did allow the candidate's election committee to solicit funds. Id. at 1322. The Eleventh Circuit's holding on this issue was based on the fact that the Canon would not prevent the candidate from learning who had contributed to his campaign and consequently from feeling beholden to those contributors. Accordingly, it was ineffective in protecting the state's asserted compelling interest. Minnesota's Canon 5B(2), on the other hand, prohibits a candidate's campaign committee from disclosing to the candidate either the identity of campaign contributors or the identity of those who were solicited for contributions but declined to contribute. The Weaver rationale is therefore inapplicable to the Minnesota Canon.[8] We need not comment on the

_____

[8]The dissent argues that because Canon 5B(2) prohibits the campaign committee from disclosing to the candidate the names of contributors and decliners, there is no compelling interest in prohibiting the candidate from signing his own solicitation letters. If the request comes from the candidate himself rather than the committee, it is natural to expect contributors to respond to the candidate rather than the committee, which would undermine the Canon's design of interposing the

conclusion expressed in <u>Weaver</u> that the distinction between judicial elections and other types of elections "if there truly is one," 309 F.3d at 1321, does not justify "greater restrictions on speech during judicial campaigns than during other types of campaigns." <u>Id.</u> <u>Cf.</u> <u>White</u>, 536 U.S. at 783 ("[W]e neither assert nor imply that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office.") We have no need to revisit our consideration of the personal solicitation clause.

***

We remand with instructions to the district court to enter judgment for the plaintiffs on Count II of the Second Amended Complaint (announce clause), to enter judgment for the defendants on Counts V (solicitation clause), and to reconsider its ruling on Counts I, III and IV (partisan activities clauses) in light of the Supreme Court's decision in this case and such further evidence as the parties may offer.

BEAM, Circuit Judge, concurring and dissenting.

I concur in the court's conclusion that the district court must enter judgment for Gregory Wersal and the other plaintiffs (collectively plaintiffs) on their "announce clause" claim. I believe that the plaintiffs are also entitled to judgment on their "partisan activities" and "personal solicitation" claims. Accordingly, I dissent from the court's holdings on these issues.

I begin by again noting that Minnesota's decision to popularly elect judges invokes the need to fully and strictly apply the requirements of the First Amendment, including the Amendment's speech and associational mandates. If Minnesota wants judicial elections, it must provide the constitutional trappings required for such

committee as the intermediary between candidate and contributors.

procedures.  As Justice O'Connor noted in her concurrence above, Minnesota cannot ignore the "'crocodile [it has chosen to place] in [its] bathtub.'"  Republican Party v. White, 536 U.S. 765, 789 (2002) (quoting former California Supreme Court Justice Otto Kaus).  Yet today, the court permits the State to do just that.

I adhere to the views expressed in my previous dissent, see, 247 F.3d at 885-903, and fully incorporate my remarks by reference.  But this case's present posture requires a further and different inquiry: What must we do on remand?  In considering this question, the court misdefines our task and renders a decision that violates both the Supreme Court's mandate and the First Amendment.

## I.    Our Task on Remand

The court (sometimes referred to as the panel majority or majority) gives great weight to its previous decision.  This is error.  The last time this case was before us, the panel majority, over my dissent, upheld the solicitation clause, the partisan-activities clause, and the announce clause.  The Supreme Court granted certiorari to consider the announce clause.  It  reversed, explained why it reversed, and remanded the *case* for proceedings consistent with its opinion.  White, 536 U.S. at 788.  On remand, instead of simply asking what the Court's order and opinion command, the majority clouds our task by misapplying the law-of-the-case doctrine.[9]

_____

[9]Footnote 5 of the court's opinion further muddies the water.  First,  the court writes that we apply the law of the case unless intervening authority clearly demonstrates that the law of the case was wrong.  Next, the court cites Shrink, a case that never mentioned the doctrine.  Then, the court ultimately concludes that the "clearly demonstrates" language is merely a redundant statement of the Shrink rule, which allows for a de novo review of legal questions.  To the extent that footnote 5 suggests that the court is conducting a de novo review of the panel's previous opinion in light of the Supreme Court's teachings, I agree with that footnote.  But I am not

-25-

We owe no deference to the court's earlier decision. The Supreme Court ordered us to proceed consistently with its opinion. Our only task on remand should be to ensure that we render, remand, or vacate consistently with the Supreme Court's mandate:

> A corollary to the principle that a mandate is completely controlling as to all matters within its compass is the rule that, upon a reversal and remand for further consistent proceedings, the case goes back . . . for a new determination of the issues presented *as though they had not been determined before*, pursuant to the legal principles enunciated in the . . . opinion.

Poletti v. C.I.R., 351 F.2d 345, 347 (8th Cir. 1965) (emphasis added). This de novo review is absolute because, when the mandate tells a lower court to proceed consistently with an opinion, the opinion and its teachings become part of the mandate. Bailey v. Henslee, 309 F.2d 840, 843 (8th Cir. 1962); see Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949 (3d Cir. 1985).

Although the court cites a case that proceeded properly on remand, Shrink Missouri Government PAC v. Adams, 204 F.3d 838, 840 (8th Cir. 2000), Shrink does not support the court's actions. The court cites Shrink for the proposition that "[w]here the Supreme Court's reasoning in disposing of one issue in a case affects the validity of our earlier disposition of other issues in the same case, we will reconsider those issues on remand." Ante at 11. Then, the court defines our task as determining whether "the law applied by this court or by the district court in deciding the partisan activity or solicitation clause issues was wrong." Ante at 13. But the court ultimately

convinced that the opinion's text says or means what the footnote suggests, and in any event, the footnote does not accurately describe the way the court actually applies the doctrine.

departs from any permissible interpretation of the law-of-the-case doctrine (or any other standard of review I can find). Two problems evidence this departure. First, the court defers to a ruling that no court has ever made. And second, the court adheres to rulings it made before, even though the Supreme Court's new teachings require precisely the opposite rulings. I address each in turn.

## II.     The Court Defers to a Ruling it Never Made

Although it is undisputed that both the partisan-activities and solicitation clauses must be justified by a compelling state interest, and although these clauses restrict core, political, election speech, the last time this case was before the court, the panel majority upheld the restrictions based on an interest it forgot to define.

> The Court of Appeals concluded that [Minnesota] had established two interests as sufficiently compelling . . . preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary. . . . [A]lthough the term is used throughout the Eighth Circuit's opinion, the briefs, the Minnesota Code of Judicial Conduct, and the ABA Codes of Judicial Conduct, none of these sources bothers to define it.

White, 536 U.S. at 775.   So the Supreme Court defined impartiality for us, and left open the *possibility* that judicial "openmindedness" is or might become a compelling state interest.

Even though the panel majority did not define "impartiality" or "openmindedness" in the previous appeal, it does not return to this compelling-state-interest question. Instead, the majority claims to have exercised remarkable foresight and near-psychic precision when it states today that it earlier "focused on what we can

-27-

now recognize as impartiality in Justice Scalia's third sense of the word: open-mindedness."[10]   Ante at 13.

This stunning metamorphosis to the determinations the panel now says it made in its previous opinion presents, to borrow Justice Scalia's words, "a challenge to the credulous." White, 536 U.S. at 780.  And the majority further states that because the Supreme Court left open the *possibility* that openmindedness might be a compelling state interest, its supposed reliance upon such an interest was not shown to be wrong. Ante at 16.  This self-serving analysis is fatally incorrect for obvious reasons.  The analysis focuses on the recognition of a newly minted compelling state interest that the Supreme Court scolded the majority for not finding or defining.

When the government suppresses election speech, the Constitution demands strict scrutiny; that is, a narrowly tailored restriction designed to serve a compelling state interest.  White, 536 U.S. at 774-75.  Yet the panel majority, in neither its previous effort nor in today's opinion, has discussed how or why "openmindedness" is a compelling state interest that can be used to suppress election speech and associational activities.  Neither did Justice Scalia.

As already noted, in its earlier opinion, the panel majority simply asserted that judicial impartiality (a term it forgot to define) was a compelling state interest.  Only later did the Supreme Court define impartiality for us.  And while the Supreme Court acknowledged openmindedness as *a possible* use as a subset of the word impartiality, and acknowledged the *possibility* that that possible subset was a compelling state interest, the panel today claims earlier reliance on this later-defined interest and,

---

[10]A computer scan of the majority's previous opinion fails to disclose its use of the words "openminded" or "openmindedness" in any definitional discussion of the words impartiality or judicial impartiality.

without further discussion, declares that it previously found this undefined interest compelling. If the panel's present statements accurately describe its earlier holdings, then one of the following statements must be true: either the Supreme Court missed the panel's previous message, or the previous panel was able to examine an undefined term so closely as to label it compelling. But neither is true. Our role as an inferior court requires that we reject the first option. And we must reject the second because the very ideas of fundamental rights and strict scrutiny require that before we deem an interest compelling, we must know what that interest is. Because neither statement is true, the court's opinion misstates what occurred.

The Supreme Court refused to pursue this crucial question because it did not believe that the Minnesota Supreme Court had adopted the "announce" clause for the purpose of protecting the openmindedness of judges. There is even less chance (hardly any chance at all) that the Minnesota court adopted the partisan-activities and solicitation restrictions to protect judicial "openmindedness." Indeed, there is almost no readily discernible connection between the words contained in these restrictions and "how a [judicial] candidate would decide certain cases if elected." Ante at 16.[11]

So, as a fundamental first step, we should ask whether "openmindedness" is a compelling state interest at all.[12] After all, the Supreme Court left open only the

---

[11]This is especially true with the solicitation clause, as shown by the panel majority's rejection of Weaver v. Bonner, 309 F.3d 1312 (11th Cir. 2002) (striking down solicitation clause). The majority opinion states that because the solicitation clause considered by the Eleventh Circuit did not prohibit the candidate from knowing of solicitation responses or declinations, as does the Minnesota rule, the Minnesota version passes muster. If this is correct, the disconnect between the rule and judicial openmindedness is all the more obvious.

[12]The New York Court of Appeals's Watson decision–which of course does not bind us–adds nothing to this case. See ante at 16 (citing In re Watson, 794 N.E.2d 1,

possibility that openmindedness, as a desirable judicial trait, rises to the level of a "compelling state interest." The Supreme Court did not find it to be so and, upon proper consideration, it may be found to fall well short of the fundamental interest necessary to fit into this constitutional category.

Then, because we have never scrutinized the restrictions under the only interest that can possibly support them (openmindedness), we should do so now. We should ask, for example, whether preventing a judge from sending his or her own fund-solicitation letter is necessary to preserve the judges "willing[ness] to consider views that oppose [existing] preconceptions, and remain open to persuasion, when the issues arise in a pending case," the hallmarks of "openmindedness" according to Justice Scalia. White, 536 U.S. at 778. This is especially true when Minnesota forbids the judge from learning of a solictee's response or lack thereof. But, beyond this question, it is my view that the solicitation clause is unconstitutional for a more specific reason. The only way the solicitation clause survives strict scrutiny is if it is necessary and narrowly tailored to further the compelling state interest of judicial openmindedness. The Minnesota canon does *not* allow a judge to even sign a solicitation request. This is one aspect of a more complicated rule purportedly designed to protect the state's interest. But this part of the restriction renders the law not narrowly tailored. Stated another way, in a state where a judge cannot learn of

---

7 (N.Y. 2003) (per curiam)). In Watson, the defendant defined impartiality, and the plaintiff did not dispute that interest's compelling status. In re Watson, 794 N.E.2d at 6. The fact that the Watson court reached this uncontested conclusion does not magically insert an analysis into the void left by the panel majority's previous decision.

his donors, to keep the judge's mind "open," must the state prohibit the judge from even signing solicitation letters?  Of course not.[13]

## III.    Underinclusiveness and the Partisan-Activities Clause

Nor do I understand, even under its misguided application of the law-of-the-case doctrine, how the panel can adhere to its view that underinclusiveness is not an independent ground to challenge a restriction on election speech (and now, by analogy, partisan activities).  I simply questioned this premise in my earlier dissent, but Justice Scalia defenestrated it in <u>White</u>: "A law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."  536 U.S. at 780 (internal marks and citations omitted).  But the panel now agrees with neither Justice Scalia nor with me.[14]

---

[13]Footnote 8 shows just how forgiving the court views the strict-scrutiny standard; indeed, the court's language appears better suited for rational-basis review. The court asserts that the ban on personal solicitation is justified because "it is natural to expect contributors to respond to the candidate rather than the committee" if the candidate signs the letter.  This footnote is wrong because it assumes that either candidates will violate the law or that their contributors will not follow the candidate's direction to reply in the way the law allows.  Why is it not "natural to expect" that candidates will obey the law and direct replies to the committee, as the rules require?  And why would we expect the contributors to do anything but obey the candidate's direction?  The record does not even approach answering (or even asking) these questions.  The court fails to realize the significance of strict scrutiny–and its burden-of-proof allocation–when it chooses, by default, the speech-suppressing answer based on its own unsupported hypothesis.

[14]Perhaps the court does not feel this language is binding.  In <u>White</u>, Justice Scalia wrote for the Court and cited that language from one of his concurring opinions.  The fact that the language used to be non-binding does not change the fact

-31-

The majority's view on underinclusiveness is an interesting but unsupportable position because I am certain that Justice Scalia meant what he wrote in <u>White</u>. His words bear repeating: "A law [here the partisan-activities restriction] *cannot* be regarded as protecting an interest of the highest order [possibly a judge's openmindedness] . . . when it leaves appreciable damage to that . . . interest unprohibited." <u>Id.</u> The panel apparently does not dispute that we must strike down the partisan-activities clause unless we regard it as protecting an interest of the highest order. But somehow (and I admit I do not see how) the court feels free to finesse this Supreme Court language to allow the partisan-activities clause to purport to protect judicial openmindedness even though the clause leaves appreciable damage (affiliation with and the support from other special-interest groups) unprohibited.[15]

_____

that it is now the law.

[15]Even though Justice Scalia wrote the applicable rule in this very case when the Court reversed the first time, the majority today ignores that language and instead relies upon <u>McConnell v. FEC</u>, 124 S. Ct. 619, 694-98 (2003). That reliance puzzles me. First, I don't understand why the court today pieces together blurbs from that several-hundred-page opinion, when Justice Scalia wrote a clear, one-sentence rule. Remarkably, even though the Supreme Court decided <u>McConnell</u> shortly after it decided <u>White</u>, and even though the <u>McConnell</u> opinion contained hundreds of pages and more citations than I care to count, the <u>McConnell</u> opinion didn't cite <u>White</u>. I am quite certain that the Supreme Court did not overlook <u>White</u> when it wrote <u>McConnell</u>. Instead, it recognized that the two cases were so different as to not even justify a single citation. But this distinction does not dissuade the court today. When the puzzle pieces seem out of place, the court pounds them until they wedge together; the problem is, the pieces are not only in the wrong place, but they are from the wrong puzzle.

Even this patchwork formulation doesn't support the court's holding. In <u>McConnell</u>, the "Court held that *the evidence* in the case supported the conclusion that television advertising posed the *greater threat*, and therefore the *record* amply justifie[d] Congress' line drawing." <u>Ante</u> at 19 (citing <u>McConnell</u>, 124 S. Ct. at 697)

(emphasis added and internal quotations omitted).  Determining which threat is "greater" requires a comparison of the two threats.  In its previous opinion, the panel majority purported to examine the threats presented by association with political parties, concluded they were not arbitrary, cited inapplicable cases that support treating political parties differently, and held that the State had satisfied its heavy burden.  But the panel majority never discussed (and it does not discuss today) the threats that special-interest-group association pose, even though the record highlights this problem.  It certainly fails to discuss "ample" record evidence (past or present) that supports the idea that political association presents a greater threat to judicial openmindedness than special-interest association.  Indeed, the record, including a Minnesota Supreme Court hearing conducted when the court was amending the ethical rules, shows that special-interest-group association posed *at least* as great a threat.  See Hearing on the Amendment to Canon 5 of the Code of Judicial Conduct, C7-81-300, Tr. at 36-37, 40 (Minn. Nov. 19, 1997) (Minnesota District Judge Gary Meyer testifying) ( The rule "allows a candidate for the judiciary to seek and use the endorsements of such special interest groups as the National Rifle Association, the Minnesota Citizens Concerned for Life, the National Organization for Women, Mothers Against Drunk Drivers, or any labor union.  Clearly, organizations such as these can and frequently do support and oppose candidates for political office. . . . It appears that the proposed changes to [the rule] are an attempt to strip political affiliation from judicial elections, but at the same time, they allow and perhaps encourage candidates to adopt issue group affiliation.  This doesn't take party politics out of the judicial election. . . . Is it appropriate for a judicial candidate to speak and appear at a MADD . . . function but not a political party?  Why should these special interest endorsements and activity be protected as constitutionally guaranteed free speech and assembly but political party endorsements and activity not be so protected.").

We should not remand to the district court to allow it to review the record for evidence that is not there.  There simply is not "ample" record evidence to show that this line drawing is necessary to advance the state's interest in an openminded judiciary, or in the appearance of an openminded judiciary.  In a gun-control case, how is the candidate's openmindedness more affected by his political affiliation than his NRA affiliation?  In an abortion case, would association with a political party

The facts establish the probability of greater harm to judicial openmindedness from association with these other narrowly focused, politically active groups who have persistent interest in many of the cases an elected judge may be called upon to decide in the Minnesota courts.[16]

Even so, the majority never examines whether these other political contacts pose an "appreciable danger." If a law cannot pass strict scrutiny when it leaves an appreciable danger unprohibited, the starting place must be to ask whether an appreciable danger exists at all and, if so, does the law leave it unprohibited? This is the essence of the "underinclusiveness" inquiry and it clearly *is* an independent ground for challenging the restriction. And although the panel correctly notes that the underinclusiveness challenge clearly points toward two other fatal defects in the Minnesota law, the unprotected-appreciable-danger challenge stands on its own and defeats the Minnesota rule.

In short, although the panel's interpretation of Supreme Court underinclusiveness jurisprudence is inventive, I choose Justice Scalia's binding

_____

influence judicial minds more than association with pro-life or pro-choice groups? To justify the restriction, even the court's proposed rule requires a "yes" answer to these questions. Because neither logic nor the record supports a "yes" answer, the Constitution forbids the line drawing.

[16]In this regard, I take judicial notice, for instance, of candidate filings contained in Minnesota Board of Campaign Finance and Public Disclosure Reports for year 2000 and in Minnesota media reports that reveal that large law firms and their members contribute substantial sums of money to judicial candidates, especially incumbent candidates, as well as to non-judicial candidates for state and federal office. See In re Ahlers, 794 F.2d 388, 392 n.1 (8th Cir. 1986) (permitting consideration of matter outside the record on appeal), rev'd on other grounds sub nom. Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988).

interpretation of the law. The Minnesota partisan-activities clause, as presently written, violates the Constitution.

## IV. CONCLUSION

The panel majority uses the discretionary, judicial-economy-based, law-of-the-case doctrine to reach an unsupportable result. Minnesota has failed to establish a "compelling state interest," at least one with a discernible connection to the regulations at issue. One regulation is woefully underinclusive and the other overly broad but with no real connection to a constitutionally protectable interest. The majority construes its previous ruling as deciding a question that did not exist when the decision was rendered. And, the panel defers to its own hypothetical ruling instead of applying the mandate of the Supreme Court. For these reasons, and those expressed in my previous dissent, I concur in the court's invalidation of the Minnesota Supreme Court's announce clause, but dissent from the court's failure to invalidate the partisan-activities and solicitation restrictions.

_____